**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF ILLINOIS**

**EASTERN DIVISION**

| | |
|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., | ) Case No. 1:20-cv-00748 |
| | ) |
| | ) Honorable Gary Feinerman |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| TY INC., and DOES 1-10, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**PLAINTIFF KELLY TOY WORLDWIDE, INC.'S MEMORANDUM OF LAW IN**

**SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

Dean D. Niro
Oliver D. Yang
VITALE, VICKREY, NIRO, SOLON & GASEY LLP
311 S. Wacker Dr., Suite 2470
Chicago, IL 60606
Telephone: (312) 236-0733
dniro@vvnlaw.com
oyang@vvnlaw.com

Todd M. Lander
Mark B. Mizrahi
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: (310) 255-6100
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

Attorneys for Plaintiffs
KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC.

## TABLE OF CONTENTS

I.     INTRODUCTION .................................................................................................1

II.    STATEMENT OF FACTS ...................................................................................2

III.   ANALYSIS ..........................................................................................................6

       A.    The Preliminary Injunction Standards ......................................................6

       B.    Kellytoy Is Likely To Succeed On The Merits .........................................6

             1.    The Squishmallows Trade Dress has developed a secondary
                   meaning ...........................................................................................7

             2.    The Squishmallows Trade Dress is non-functional ......................12

                   a.   The Squishmallows Trade Dress does not have any design
                        elements that have been subject to a utility patent ............13

                   b.   The Squishmallows Trade Dress provides no utilitarian
                        advantage ............................................................................14

                   c.   Kellytoy has not advertised utilitarian advantages of
                        Squishmallows .....................................................................16

                   d.   Many alternate designs for stuffed animals exist ...............16

                   e.   The Squishmallows Trade Dress
                        does not affect quality or costs ..........................................16

             3.    Customers are likely to be Confused ............................................17

                   a.   The Squishmallows Trade Dress and the Infringing Plush
                        are similar in appearance and suggestion ........................18

                   b.   Squishmallows and the
                        Infringing Plush are similar goods ....................................19

                   c.   Squishmallows and the Infringing
                        Plush are sold in the same area .........................................20

                   d.   The consumer's degree of care .........................................20

                   e.   The Squishmallows Trade Dress is strong .........................21

                   f.   Actual confusion ................................................................21

                   g.   Ty intended to palm off its products as Squishmallows .....22

       C.    Kellytoy Will Suffer Irreparable
             Harm Absent A Preliminary Injunction ..............................................22

**D.**      **The Irreparable Harm to Kellytoy Outweighs**
**The Potential Harm Ty Would Suffer Were**
**A Preliminary Injunction Wrongfully Granted** ..................................24

**E.**      **The Public Interest Will be Served By Granting the Injunction** .........24

**F.**      **Injunction Bond** ......................................................................25

**IV.**    **CONCLUSION** ................................................................................25

# **TABLE OF AUTHORITIES**

## **Federal Cases**

*Badger Meter, Inc. v. Grinnell Corp.*,
 13 F.3d 1145 (7th Cir. 1994) ...................................................7, 12, 17, 18, 20, 21

*Bodum USA, Inc. v. A Top New Casting Inc.*,
 927 F.3d 486 (7th Cir. 2019) ...................................................7, 12, 13, 15, 16

*Cae, Inc. v. Clean Air Engineering, Inc.*,
 267 F. 3d 660 (7th Cir. 2001) ...................................................................21

*Deckers Outdoor Corporation v. The Partnerships, et al.*,
 2013 WL 1337616 (N.D. Ill. March 27, 2013) ......................................25

*Eli Lilly & Co. v. Natural Answers, Inc.*,
 233 F.3d 456 (7th Cir. 2000) ...............................................................25

*Ferrari S.P.A. v. Roberts*
 944 F.2d 1235 (6th Cir. 1991) ..............................................................8

*Ga.–Pac. Consumer Prods. LP v. Kimberly–Clark Corp.*,
 647 F.3d 723 (7th Cir. 2011) ..............................................................13

*Gurglepot, Inc. v. New Shreve, Crump & Low LLC*,
 153 F.Supp.3d 441 (D. Mass 2015) ......................................................8

*Health O Meter Inc. v. Terraillon Corp.*,
 873 F.Supp. 1060 ...................................................................................7

*Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*,
 560 F.2d 1325 (7th Cir. 1977) .............................................................22

*International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*,
 846 F.2d 1079 (7th Cir.1988) .....................................................6, 18, 23

*KJ Korea, Inc. v. Health Korea, Inc.*,
 66 F. Supp. 3d 1005 (N.D. Ill. 2014) .......................................19, 20, 21

*Logan Graphic Prod., Inc. v. Textus USA, Inc.*,
 No. 02 C 1823, 2003 WL 21011746 (N.D. Ill. May 5, 2003) ....................12, 15, 16

*Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule
 "A,"*
 2015 WL 3818622 (N.D. Ill. 2015) ......................................................22

*Malletier v. Burlington Coat Factory Warehouse Corp.*,
 426 F.3d 532 (2nd Cir. 2005)...............................................................18

*Michalic v. Cleveland Trankers, Inc.*,
   364 U.S. 325, 81 S.Ct. 6 (1960) ........................................................................8

*Minemyer v. B-Roc Representatives, Inc.*,
   678 F. Supp. 2d 691 (N.D. Ill. 2009) ..............................................................8

*Packman v. Chicago Tribune Co.*,
   267 F.3d 628 (7th Cir. 2001) ........................................................................17

*Promatek Indus., Ltd. v. Equitrac Corp.*,
   300 F.3d 808 (7th Cir. 2002) ........................................................................19

*Qualitex Co. v. Jacobson Products Co.*,
   514 U.S. 159 (1995) ................................................................................8, 13

*Re/Max N. Cent., Inc. v. Cook*,
   272 F.3d 424 (7th Cir. 2001) ........................................................................22

*Roulo v. Russ Berrie & Co.*,
   886 F.2d 931 (7th Cir. 1989) ..........................................................................7

*Scherr v. Volpe*,
   466 F.2d 1027 (7th Cir. 1972) ......................................................................25

*Service Ideas, Inc. v. Traex Corp.*,
   846 F.2d 1118 (7th Cir. 1988) ......................................................................15

*Stuller, Inc. v. Steak N Shake Enterprises, Inc.*,
   695 F.3d 676 (7th Cir. 2012) ..........................................................................6

*Sylvester v. SOS Children's Villages Illinois, Inc.*,
   453 F.3d 900 (7th Cir. 2006) ..........................................................................8

*Thomas & Betts Corp., v. Panduit Corp.*,
   138 F.3d 277 (7th Cir. 1998) ................................................................7, 9, 10

*Top Tobacco v. Fantasia Distribution Inc.*,
   101 F. Supp. 3d 783 (N.D. Ill. 2015) ..........................................17, 19, 20, 21

*Trans Union LLC v. Credit Research, Inc.*,
   142 F. Supp. 2d 1029 (N.D. Ill. 2001) ............................................................7

*Turnell v. CentiMark Corp.*,
   796 F.3d 656 (7th Cir. 2015) ..........................................................................6

*Ty, Inc. v. Jones Grp., Inc.*,
   237 F.3d 891 (7th Cir. 2001) ......................................................6, 17, 18, 19, 24

*Wal-Mart Stores, Inc. v. Samara Bros.*,
   529 U.S. 205 (2000) ........................................................................................7

**Federal Statutes**

11 U.S.C. § 1125 ................................................................................................................6, 17

## I.     __INTRODUCTION__

Imitation may indeed by the height of flattery, but in nakedly imitating the distinctive look and feel of Kellytoy Worldwide, Inc.'s ("Kellytoy") Squishmallow's plush toys, Ty, Inc. ("Ty") has accelerated past the line of permissible competition and into an obvious infringement of the Squishmallows trade dress. And given the transparent nature of the infringement and the clear resulting risk to Squishmallows' hard earned goodwill, only a preliminary injunction can prevent Kellytoy from suffering irreparable harm.

The facts and law demanding this result are straightforward. Kellytoy introduced the Squishmallows line – a series of plush toys with abstract depictions of popular animals – in 2017, and did so after a lengthy design process focused on creating a line of toys that maintained a unique combination of features heretofore not seen in the U.S. marketplace. It succeeded. In fact, Kellytoy's designers and an independent industry expert confirm below that assembly of non-functional characteristics – namely, an egg/bell shape without discrete limbs and no torso, embroidered facial features based on the Japanese Kawaii style, and a soft shell with a squishy stuffing – are not found on other plush toys in the United States. Nor is there any doubt that the overwhelming consumer and industry reaction to Squishmallows give rise to clear secondary meaning under applicable law, affording Squishmallows durable trade dress rights. The assembly of evidence set out below, including extensive advertising and marketing, 40 million units shipped to national retailers in three years, widespread consumer engagement on social media and otherwise, all put that question firmly to rest.

Ty, against that backdrop, now seeks to misappropriate that goodwill by selling competing goods that unambiguously copy the particular look and feel of Squishmallows. That Ty is deliberately converting the unique combination of elements defining the Squishmallows trade dress cannot be the subject of any reasonable dispute. A simple review of two of the parties' respective products confirms the intentional nature of this infringement:

Kellytoy Squishmallow



Ty's Squish-a-Boo



Beyond that, the concurrently filed declaration of an established industry expert – Richard Gottlieb – echoes that inevitable conclusion, making this a garden variety infringement case: Squismallows embody protectable trade dress that Ty is knowingly infringing.

That much resolves the likelihood that Kellytoy will ultimately prevail on the merits of its claims – it will. But it will also suffer clear irreparable harm if Ty is not enjoined as requested. Specifically, Ty intends to market its infringing toys nationwide – and has already exhibited them at toy industry trade shows – and the imminent threat of that full throated infringement campaign cannot be overstated. Ty should not be permitted to trade off of the Squishmallows goodwill and in the process confuse the public into believing that Ty's Infringing Plush[1] originates from or is associated with Kellytoy's originals. Kellytoy has the exclusive right – indeed, the duty – to control its reputation, but it cannot control the quality of infringing goods, be they Ty's or another competitor's. And the more the public is exposed to Ty's competing products, ones incorporating the features of the Squishmallows Trade Dress (shape, etc.), the less resonant and valuable will be the trade dress in functioning as indicia of product source. Left with no other option in protecting its rights, Kellytoy now moves this court for a preliminary injunction to prevent Ty from distributing the Infringing Plush until this case is resolved.

## II.     STATEMENT OF FACTS

Kellytoy creates, manufactures, distributes, and sells unique plush toys. (Declaration of Jeanne Yoon ("Decl. Yoon") ¶ 8.) This includes the highly successful and famous Squishmallows line of plush animals, which Kellytoy created Squishmallows in 2016. (*Id.* ¶ 9.)

---

[1] *See* Exhibit I to the Mizrahi Declaration attaching photographs of the Infringing Plush.

That creation introduced a new class of plush toys and carved a previously non-existent niche in the marketplace, and the public has enthusiastically embraced Squishmallows – Kellytoy has shipped approximately 40 million units of Squishmallows since the summer of 2017, resulting in tens of millions of dollars in revenue to Kellytoy. (*Id.* ¶ 23.)

The scope of this success is the product of deliberate design decisions intended to distinguish Squishmallows from other plush toys. Jeanne Yoon – Kellytoy's Vice-President of Sales and Development – explains in her declaration, for example, that Kellytoy's designers settled on the particular elements of the Squishmallows design to create an identifiable look and feel that would distinguish Kellytoy's goods from others in the marketplace. (*Id.* ¶ 10.) Those elements include: (1) a specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs; (2) abstract, embroidered facial features based on the Japanese Kawaii style; (4) oval/rounded graphic features; and (5) an ultra-soft shell and mooshy, silky stuffing, as more fully described at Paragraph 31 of the Complaint (the "Squishmallows Trade Dress"). (*Id.*) And Ms. Yoon attaches, as Exhibit 1 to her declaration, examples of Squishmallows reflecting the unmistakable trade dress they embody. (*Id.*, Ex. 1.) Beyond that, the commercial peculiarity of that combination of features, and the fact that Squishmallows are the only plush toy line embodying them, is confirmed by Richard Gottlieb – an experienced toy industry expert – whose accompanying declaration makes clear that these toys "possess a distinctive overall look and feel that is not shared by the plush toys of others in the marketplace." (Gottlieb Decl. ¶ 16.) Mr. Gottlieb's expert conclusion is based on his review of thousands of plush toys – constituting a representative sample of the marketplace – as a means of testing the distinctive nature of Squishmallows. (*Id.* ¶ 13.)

That singularity of combined features has facilitated the undeniable popularity of Squishmallows, and the resonance of their design with the consuming public and the industry at large. These goods are sold nationwide and in the country's largest retailers, including Costco, Walmart, Walgreens, CVA, Kroger, Fred Meyer, Target, Party City, Dave & Busters and Knotts Berry Farm. (*Id.* ¶ 22.) Squishmallows have also been featured in various national media – Ok! Magazine, E! News, the Chicago Tribune, the Washington Post, the Pittsburgh Post-Gazette and

the Houston Chronicle, a mere sampling of the media attention generated – and have received numerous industry awards, *e.g.,* by the National Parenting Product Awards, Toys Tots Pets & More, Parents' Choice, HowToLearn.com, Creative Child, The Mom's Choice Awards, and The National Parenting Center.  (*Id*. ¶¶ 10, 22 and 23.)  Given this consumer buzz, industry insiders have not surprisingly recognized Squishmallows in myriad ways, *e.g.*, Toy Insider named Squishmallows as one of the top holiday toys, Toy Book Magazine featured them in a cover story, and Teddy Bear and Friends Magazine and Animal Tales Magazine likewise featured them and their market success.  (Declaration of Elisa Vazquez ("Decl. Vazquez") ¶¶ 32-33).)

Perhaps the most compelling evidence of Squishmallows' trade dress, however, is the demonstrable public appetite for information concerning and access to these goods.  Dan Grody, a longtime public relations executive Kellytoy retained to coordinate the marketing of Squishmallows, explains more particularly that – in decades of managing PR campaigns – he has never seen the level of consumer engagement Squishmallows has realized since 2017.  (Grody Decl. ¶ 9.)  Mr. Grody recounts, for example, that a review of Google Trends – tracking search terms and topics – over the past twelve months reveals the significant global force Squishmallows has become, one that in the fall of 2019 surpassed the highly successful Ty's Beannie Boos and Aurora's YouHoo & Friends in search volume.  (*Id*. ¶ 13.)  And that engagement is particularly telling given the limited time Squishmallows have been in the market.  Mr. Grody again provides important context in this regard, noting that the metrics he relies upon show that Squishmallows are continuing to expand in popularity at a time (three years post launch) when most brands experience declines, and that the return on marketing investment Kellytoy is enjoying exceeds that of other lines that have devoted far more in resources and time.  (*Id.* ¶ 14.)  Kellytoy is, in other words, spending less and receiving more on Squishmallow than other toy manufacturers have achieved concerning other brands, a fact Mr. Grody assigns to the distinctive characteristics and look and feel of the goods themselves.  (*Id.*)

Mr. Grody's conclusions are echoed by the evidence of direct consumer engagement of their fans on social media specifically.  Those legions of fans share Kellytoy's social media posts with their followers on Facebook, Instagram, Pinterest, YouTube, and other sites, resulting in

millions of "likes." (Decl. Vazquez ¶ 15.) A simple Google search for the term *Squishmallows*, for example, returns more than a million results, and countless user-created videos appear on YouTube of fans using and collecting Squishmallows plush toys. (Decl. Yoon ¶ 16; Decl. Vazquez ¶ 27). These fans even put the Squishmallows to transformative uses, such tutorials on how to draw Squishmallows or stop-motion videos. (Decl. Vazquez ¶ 27.) Nor is there any doubt that these consumers identify Squishmallows' look and feel as source identifiers. Mr. Grody's Declaration includes, for example, a sampling of recent social media posts from consumers explaining generally their effort to locate Squishmallows, and their disappointment in discovering that some of what they discover are knock-offs. (Decl. Grody ¶ 16.) Those posts are revealing in multiple respects, but most tellingly they reflect the consumers' understanding that there are "official" Squishmallows and, by corollary, imitation goods whose origins they do not recognize. And that recognition, in turn, establishes that the combination of features Kellytoy designed is operating precisely as intended – to identify the source of origin of Squishmallows.

That consumer recognition, like the product design, did not occur by accident. To the contrary, Kellytoy has spent handsomely advertising and promoting Squishmallows since their 2017 launch, and indeed maintains an annual marketing budget of $1,000,000 devoted specifically to these goods. (Yoon Decl., ¶ 14.) This includes advertisements to consumers and business-to-business advertisements and, as mentioned above, a robust social media presence dedicated to Squishmallows – these goods have more than 109,000 Instagram followers, 82,000 Facebook followers, and 12,000 Twitter followers, more than many longer-existing and well-known plush brands. (Decl. Vazquez ¶ 14.) Through public relations activities alone, not including paid advertising, Kellytoy's Squishmallows branded plush toys have garnered over 200 MILLION media impressions and close to another 100 MILLION impressions through paid placements on Facebook and Instagram. (Decl. Grody ¶ 12.)

All of which is to reiterate what is apparent from the record – Kellytoy could have chosen alternate designs for Squishmallows, but instead chose the elements of the Squishmallows Trade Dress to create an easily-identifiable line of toys to distinguish it from the goods of others. Those decisions were not motivated by cost – Kellytoy could have chosen alternative designs

that are less expensive to produce and, in fact, it produces numerous plush toys that cost less to produce than Squishmallows. (Decl. Yoon ¶ 11.) And that fact is important, because Ty, or other Kellytoy competitors, could create plush toys with alternate designs without any disadvantage – other than the disadvantage of not riding on the Squishmallows good will. (*Id.*) For the reasons explained below, however Ty's intentional decision to misappropriate that good will presents a case where the very essence of trade dress protection is implicated, and where nothing less than injunctive relief will assure that justice is done.

### III.     ANALYSIS

#### A.     The Preliminary Injunction Standards

To obtain a preliminary injunction, a plaintiff must show: (1) the plaintiff has a reasonable likelihood of success on the merits; and (2) the plaintiff will suffer irreparable harm absent a preliminary injunction and has no adequate remedy at law. *Stuller, Inc. v. Steak N Shake Enterprises, Inc.*, 695 F.3d 676, 678 (7th Cir. 2012); *Turnell v. CentiMark Corp.*, 796 F.3d 656, 661–62 (7th Cir. 2015). If the plaintiff makes this showing, the court considers (3) the irreparable harm the defendant will suffer if preliminary relief is granted balanced against the irreparable harm the plaintiff will suffer if relief is denied; and (4) the public interest in granting or denying the preliminary injunction. *Id.*

#### B.     Kellytoy Is Likely To Succeed On The Merits

A plaintiff satisfies the first requirement if it shows that it has "some likelihood" of success on the merits. *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 896 (7th Cir. 2001) ("Initially, the court only needs to determine that the plaintiff has some likelihood of success on the merits.") This requires only a "better than negligible" chance of succeeding on the merits. *Id.* (quoting *International Kennel Club of Chicago, Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1084 (7th Cir.1988)). To succeed on the merits of a trademark action, a plaintiff must prove (1) that it has a protectable trademark, and (2) a likelihood of confusion as to the origin of the defendant's product. *Id.* at 897; *see also* 11 U.S.C. § 1125(a).[2] Trade dress encompasses the overall "look

---

[2] Kellytoy's trademark infringement and unfair competition claims alleged in the complaint, under Illinois

(Continued…)

and feel" of a product, including its size, color or color combinations, texture, graphics, packaging or other visual features that connote the source of such goods in the minds of consumers – essentially serving the function of a trademark. *See e.g., Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 936 (7th Cir. 1989); *see also Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1151 (7th Cir. 1994). That is, in certain circumstances, trade dress may extend to features (e.g., shape, texture etc.) of the product itself. *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 216 (2000). A plaintiff has a protectable trademark in a product's design if it has acquired a secondary meaning and is non-functional. *Id*. at 211; *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 491 (7th Cir. 2019). As explained below, Kellytoy meets this test and is more than likely to prevail on the merits.

1. **The Squishmallows Trade Dress has developed a secondary meaning**

The Seventh Circuit employs a several-factor factual analysis to determine whether a particular product design has acquired secondary meaning, including: (a) the amount and manner of advertising; (b) the volume of sales; (3) the length and manner of use; (4) consumer surveys; (5) evidence of intentional copying; and (6) unsolicited media coverage. *See Thomas & Betts Corp., v. Panduit Corp.,* 138 F.3d 277, 293 (7th Cir. 1998). The ultimate import of these factors is to determinate when "in the minds of the public, the primary significance of a product feature . . . is to identify the source of the product rather than the product itself." *Id.* at 291. The *Thomas & Betts* Court observed, for example, that a mark holder may establish secondary meaning by means of "direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Id*. at 291.[3] Nor does the law make any distinction between the weight to be given to either direct or circumstantial evidence and, indeed, circumstantial evidence may often be "more

---

statutory and common law, are subject to the same analysis as its Lanham Act claim for purposes of determining likelihood of success on the merits. *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001) (granting preliminary injunction).

[3] We note that the Seventh Circuit has long held that survey evidence is not required to prove secondary meaning. *See e.g., Health O Meter Inc. v. Terraillon Corp.,* 873 F.Supp. 1060. 1173 (N.D. Ill. 1995).

certain, satisfying and persuasive than direct evidence." *Michalic v. Cleveland Trankers, Inc.*, 364 U.S. 325, 330, 81 S.Ct. 6, 11 (1960); *see also Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 704-05 (N.D. Ill. 2009); *Sylvester v. SOS Children's Villages Illinois, Inc.*, 453 F.3d 900, 903 (7th Cir. 2006); *and see* Federal Civil Jury Instructions of the Seventh Circuit 1.12 ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence.")

These general principles aside, trade dress protection supports a specific and important policy consideration striking at the heart of intellectual property law – namely, advancing the economic policies of trademark law, a principal one of which is to reduce consumers' search costs by "quickly and easily assur[ing] a potential customer that *this* item – the item with this mark – is made by the same producer as other similarly marked items that he or she liked (or disliked) in the past." *Qualitex Co. v. Jacobson Products Co.*, 514 U.S. 159, 164 (1995). Beyond that, trade dress emphasizes the law's encouragement of investment in brand development and, by corollary, the discouragement of free-riding. Specifically, trade dress protection "helps assure a producer that it (and not an imitating competitor) will reap the financial, reputation-related rewards associated with a desirable product." *Id.* And it likewise and conversely discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale. *Id.* at 164.

The enforcement of that policy ensures that source identifying characteristics are afforded the protection they deserve and the consuming public expects. The Sixth Circuit found in *Ferrari S.P.A. v. Roberts*, for example, that the shape and design of specific Ferrari models had penetrated the marketplace sufficiently to preclude the defendant from selling fiberglass kits that would allow one to make a non-Ferrari car look like a Ferrari model: "Ferrari charges, and the district court found, that the unique and distinctive shape and design of the Daytona Spyder and the Testarossa are protected trade dress which Roberts has infringed by copying them and marketing his replicas." 944 F.2d 1235, 1239 (6th Cir. 1991); *see also Gurglepot, Inc. v. New Shreve, Crump & Low LLC,* 153 F.Supp.3d 441, 449 (D. Mass 2015) (public association with distinctive shape and appearance of plaintiff's goods render it protectable trade dress).

Kellytoy has plainly established a secondary meaning under these principles. It has created certain finite and distinguishable characteristics that are consistent through its line of Squishmallow toys, and which serve a clear source identifying function to the consuming public. Those features are described above, and include the egg/bell shape with no proportionate, pronounced limbs (the absence of which amplifies the distinctive shape), the Asian Kawaii faces and complementary rounded graphics, embroidered facial features, distinctive monochrome coloring and short pile velvety texture and silky memory-foam-like stuffing. (Decl. Yoon ¶ 10.)

The fact that these characteristics were the product of deliberate design decisions emphasizes the uniqueness of the Squishmallows' look and feel. As Ms. Yoon explains in her declaration, the product creators at Kellytoy consciously crafted the shape and look of the Squishmallow line to reflect a specific artistic expression that would immediately be identifiable by the consuming public, and would in turn identify Squishmallows to the exclusion of all other plush toys. (*Id.* ¶ 12.) And they did so by surveying the marketplace for purposes of tracking the standard features of these toys and designing products that maintained consistent and combined qualities that *are not* found on competing toys. (*Id.* ¶ 13.) Nor is there any reasonable doubt that Squishmallows' combination of features is unique in the marketplace. As noted above, Richard Gottlieb, the toy industry expert, explained – as noted above – he has "never seen a single plush toy incorporating all of these features and otherwise being expressed quite the way they appear in the Squishmallows." (Decl. Gottlieb, ¶ 16.) The Squishmallows features, in other words, present an abstract, and yet identifiable, expression of the animals that are included in the line, and they consequently reflect a look and feel that is unique to Kellytoy's plush goods.

That commercial reality is a matter of undeniable fact in the marketplace, nor is there any doubt that Squishmallows have penetrated the consciousness of the consumer, and acquired durable secondary meaning.

***The amount and volume of advertising.*** As a starting point, Kellytoy's advertising campaign evidences the extent to which consumers have embraced the look and feel of Squishmallows as source identifying features under *Thomas & Betts, supra.* Mr. Grody – a principal at Tellum Grody Public Relations, Inc. ("TGPR") – and Elisa Vazquez of Kellytoy

establish, among other things, that TGPR has overseen the Squishmallows marketing campaign since 2017 and has been stunned by the level of consume recognition and engagement with the campaign. Mr. Grody recounts, for example, that (1) the dedicated Squishmallows.com website receives in excess of 5,500 visits *per day* on its website traffic consistently ranks in the top 50,000 for U.S. sites (and top 125,000 for global sites) and recorded as high as 14,162 in the U.S. in December 2019[4]; (2) Squishmallows currently has over 104,000 Instagram followers, over 80,000 Facebook followers, and more than 10,000 Twitter followers; (3) Squishmallows has more than 28.5K organic posts on Instagram that use the official hashtag (#Squishmallows), and the average Squishmallows post likes on Instagram hovers at over 3000+ per post and 100+ average comments per post; (4) through public relations activities alone, not including paid advertising, Kellytoy's Squishmallows branded plush toys have garnered over 200 MILLION media impressions, including paid placement on Facebook and Instagram since July 21, 2017 that total 23.6 MILLION unique individuals and 83.7 MILLION impressions; and (5) digital advertisements used by Kellytoy to advertise its Squishmallows plush toys in conjunction with specific retailers have yielded average click through rates of 30+%, while the industry average is about 1-2%. (Dec. Grody ¶ 10-13.)

*Volume of Sales.* Mr. Grody emphasizes that the extent of consumer response to the Squishmallows campaign in such a short time is unprecedented in his experience, and the data to which he testifies – and the testimony of Mr. Gottlieb, the toy industry expert – establish that the Squishmallows trade dress has acquired secondary meaning. (Decl. Grody ¶ 9; Decl. Gottlieb ¶ 16.) And the remaining *Thomas & Betts* factors merely serve to confirm that obvious legal conclusion. The volume of Squishmallows sales, to take one particularly apropos example, squares directly with the data and observations of Messrs. Grody and Gottlieb. Squishmallows have sold and shipped approximately 40,000,000 (40 million) units since 2017, a figure in

---

[4] To put this into context, there are nearly 1 3/4 billion websites available on the World Wide Web. (Mizrahi Decl., at ¶ 2.) As one might expect, the most popular websites the United States are Google, YouTube, Facebook, Amazon – with Apple.com being at number 30. (Mizrahi Decl., at ¶ 3.)

harmony with the consumer response Mr. Grody recites and the particularized characteristics Mr. Gottlieb focused upon.  (Decl. Grody ¶¶ 13-14; Decl. Gottlieb ¶ 10.)  Ms. Yoon amplifies those facts, explaining that in twenty years as a primary toy manufacturer Kellytoy has never experienced anything like the explosion of Squishmallows popularity. (Decl. Yoon ¶ 27.)

      ***Length and manner of use.***  The Grody and Yoon Declarations demonstrate that Squishmallows have been consistently and continuously been sold in the marketplace since 2017, and they have always included the features discussed above and which embody the product's trade dress.  It is those abstract features and the consistency of their use that distinguishes Kellytoy's Squishmallows from its competitors.  And Kellytoy's advertising educates the consuming public concerning those features through "look for" advertising.  Ms. Yoon explains in her declaration, for example, that Kellytoy's press releases, social media sites, marketing materials and stationary all expressly states that the "shape, look, feel, and texture of Squishmallows® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress."  (Decl. Yoon ¶¶ 18-21.)

      ***Consumer Evidence.***  The widespread evidence discussed above is substantiated by direct consumer evidence of source identifying recognition.  Ms. Yoon again provides particulars, including among other things that the Google search engine yields over 1,370,000 "hits" for Squishmallows, and Mr. Grody additionally recounts the voracious consumer appetite for these products in his declaration.  (Decl. Yoon ¶ 16, Grody ¶¶ 13-14.)  But within the perpetual stream of public commentary on social media concerning Squishmallows is specific consumer recognition that there are "official" Squishmallows.  A sampling of Facebook posts demonstrate in fact the products' many fans search high and low for Squishmallows they have not previously seen and which they want to add to their collection – and knock off brands that are the product of competitors' efforts to confuse the public into believing that their imitation goods are in fact made by the same manufacturer as Squishmallows.  This evidence, in short, demonstrates that: (1) the consuming public has identified Squishmallows resolutely; (2) a sub-culture of Squishmallows followers has formed, and which communicates with one another about Squishmallows through social media; and (3) this degree of devotion and continuous

commentary is, in the plush toy industry, particular to Squishmallows. (Decl. Vazquez ¶ 15.)

*Media Coverage/Industry Recognition.* Squishmallows have been the subject of repetitive and extensive media coverage. Ms. Vazquez sets out in her declaration, for example, a long list traditional and internet press coverage that has focused on these goods, coupled with a steady stream of media events and trade publications that likewise have focused on Squishmallows. (Decl. Vazquez ¶¶ 20-31.) To name just a few, Squishmallows were featured in issues of *OK! Magazine, L.A. Parent* Magazine, *City Parent Magazine*, and *San Diego Family Magazine* and included in the 2017, 2018, and 2019 gift guides for various publications, including in *The Washington Post*, *The Houston Chronicle*, E! News, and *L.A. Parent*. (Decl. Vazquez ¶ 22.) That is in addition to the numerous industry awards these goods have received, and which are mentioned above. (*Id.* ¶ 10.) This collectively supplements the myriad evidence already assembled concerning secondary meaning, and serves to confirm what that evidence makes obvious – Squishmallows possess protectable trade dress.

*Deliberate Copying.* That Ty deliberately copied the Squishmallows Trade Dress is beyond any reasonable dispute. Ty transparently and self-consciously copied that trade dress in its effort to convert the goodwill Kellytoy has generated in its Squishmallows plush toys. Lest there be any doubt, Mr. Gottlieb – the industry expert – makes clear that Ty decided to "fully duplicate the look and feel of the Squishmallows trade dress." (Decl. Gottlieb ¶ 22.) Indeed, Ty has not merely created an outwardly similar product, but Ty has self-consciously copied details that relate "specifically to the combined characteristics that make Squishmallows unique in the marketplace." (*Id.* ¶ 21.) This is, in short, deliberate and willful copying. (*Id*. ¶ 20.)

### 2. <u>The Squishmallows Trade Dress is non-functional</u>

To be protectable, trade dress, *as a whole*, cannot be solely functional. *See Bodum*, 927 F.3d at 491. Functionality must be analyzed by reference to the overall combination and arrangement of the various features – not on the functionality of each of the individual features. *Badger*, 13 F.3d at 1154; *Logan Graphic Prod., Inc. v. Textus USA, Inc.*, No. 02 C 1823, 2003 WL 21011746, at *4 (N.D. Ill. May 5, 2003).

That said, a product's trade dress may have a "function" in the everyday meaning of the

term without being "functional" within the meaning of trademark law. *See Bodum*, 927 F.3d at 492. A French press coffeemaker has, for example, protectable trade dress in the product's overall appearance even though all of the product design elements have functions, including a handle, lid, feet at the bottom, and a round knob for the strainer. *Id.* ("[T]o establish it has a valid trade dress, [the plaintiff] did not have to prove that something like a handle does not serve any function. It merely needed to prove that preventing competitors from copying the [French press's] particular design would not significantly disadvantage them from producing a competitive and cost-efficient French press coffeemaker."). Thus, the defendant may not copy the plaintiff's combination of these elements even where the plaintiff could not claim trade dress in an individual element. *Id.* at 493.

Functionality may not, in that regard, be used to defeat trade unless that trade dress ***as a whole*** is "'essential to the use or purpose of the article or if it affects the cost or quality of the article,'" or if its use is "a competitive necessity" because not using the trade dress would put competitors at a significant non-reputation-related disadvantage. *Id.* at 491 (quoting *Qualitex*, 514 U.S. at 165). In assessing that question, the Seventh Circuit courts consider: (1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost. *Id.* (citing *Ga.–Pac. Consumer Prods. LP v. Kimberly–Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011)). No single factor is dispositive and courts consider each factor separately. *Id.*

   a. *The Squishmallows Trade Dress does not have any design elements that have been subject to a utility patent*

The first factor weighs in favor of non-functionality. Kellytoy has never filed for a utility patent for the Squishmallows plush toy as a whole, or for any element thereof. (Decl. Yoon ¶ 41.)

b.   *The Squishmallows Trade Dress provides no utilitarian advantage*

When viewed as a whole – as required under applicable law – the Squishmallows Trade Dress cannot reasonably be characterized as providing a utilitarian advantage.  The subject goods comprise plush toys, rather than utilitarian goods such as tools, chairs, etc.  In addition, the claimed trade dress does not include clasps or other functional features.  Rather, it is comprised of elements of design and aesthetics, calculated to provide a unique/distinguishing "look and feel" across a line of plush toys to identify them as genuine Squishmallows.

As explained above, and in light of their overall shape, the Squishmallows plush toys embodying the Squishmallows Trade Dress lack a discrete head or torso or pronounced/proportionate limbs.  They are, in fact, highly abstracted renditions of animals or other creatures, designed to conjure images of the creatures they depict but without accurately representing their physiognomy.  The limbless egg/bell shape of Squishmallows does not provide any utilitarian advantage over the countless alternative shapes available, such as round, square, oblong, or realistic to an animal's shape.

Despite that, Ty suggested in prior correspondence that "the oval pillow shape of Kellytoy's products is functional for the additional reason that the oval shape permits the product to sit upright for display or play, while still maintaining a pillow like appearance with a tapered and smaller area for display of the head portion of the product."  Setting aside for the moment that the capacity to sit upright provides ***no net advantage***, this self-serving assertion ignores the fact that, if designing a toy that could sit in this manner was the purpose, Kellytoy could easily have achieved the same goal by shaping them as flat bottomed and flat topped ovals, squares, rectangles, spheres, etc.  Stated another way, having them taper towards the top represents a design choice, not a utilitarian/functional choice.

Regardless, Squishmallows do not reliably stand.  It takes little if anything to knock them over, and the fact that they are typically handled by children while sitting on the retailer's shelves will all but ensure that they will not be standing upright for very long, unless independently supported.  More to the point, if standing upright provided a utilitarian advantage, Kellytoy would have designed Squishmallows to stand up more stably, e.g., as squares,

rectangles, triangles, spheres, cylindrical, oblong/lateral pillows, etc. or with a much wider base relative to the upper portion. (Decl. Yoon ¶ 37.) The same holds true for having them stand up for purposes of play – they lack the stability to support the allegation that their shape was dictated by utilitarian considerations. (*Id*.)

In any event, an ability to stand does not make the Squishmallows Trade Dress functional because consumers do not select Squishmallows for their ability to stand. Indeed, numerous social media posts by Squishmallows consumers show the products on their sides, backs, and being held by users as does numerous posts/advertisements placed by Kellytoy. (*See* Decl. Vazquez ¶ 35, Ex. F.) Thus, standing is not essential to the use or purpose of Squishmallows.[5]

Even if eyes, mouths, or coloring have a function in stuffed animals, Ty is not free to copy the look and feel created by Kellytoy's selection of the combination of these features. *See Bodum*, 927 F.3d at 492. The Squishmallows Trade Dress expresses those features in its own way giving Kellytoy's Squishmallows a distinctive overall look and feel, especially when viewed in combination with the other features of the Squishmallows Trade Dress. If a plaintiff "seeks to protect the overall look of its product – the combination and arrangement of the various features – the appropriate inquiry focuses on the overall trade dress and not on the individual features." *Logan*, 2003 WL 21011746, at *4. In our case, rather than copying the overall look and feel of Squishmallows, Ty could have employed countless other features that would not infringe Kellytoy's trade dress. *See supra; see also Bodum*, 927 F.3d at 492 (combination of functional elements still trade dress because competitor could have used alternative designs of the elements); *Service Ideas, Inc. v. Traex Corp.*, 846 F.2d 1118, 1123–24 (7th Cir. 1988).

This merely serves to confirm what it obvious – no particular element of the Squishmallows Trade Dress provides a utilitarian advantage, much less all the elements in

---

[5] The remaining elements of the Squishmallows Trade Dress are likewise nonfunctional. In addition to their unusual shape (with the absence of discrete head and torso or proportionate limbs), further supporting their abstracted overall appearance, they also possess simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features on the characters themselves (such as eyes, snouts and bellies) and which conform to and support the overall egg/bell shape of the toys; (3) embroidered facial features, such nostrils, and/or mouths; (4) distinctive contrasting and non-monochrome coloring.

combination. Rather, Kellytoy designed the Squishmallow Trade Dress – with its unitary
aesthetic across its Squishmallows line – to distinguish the source of products embodying the
Squishmallow trade dress from the source of other toys. (Decl. Yoon ¶ 48.)

        c.    *Kellytoy has not advertised utilitarian advantages of Squishmallows*

Kellytoy has never advertised any utilitarian advantages of its Squishmallows, other than
the fact that the Squishmallows can be used as pillows – something that holds true for the vast
majority of plush toys. (Decl. Yoon ¶ 42.) Kellytoy has never advertised that the
Squishmallows stand or sit on their bottoms. (Decl. Vazquez ¶ 34.)

        d.    *Many alternate designs for stuffed animals exist*

The existence of competing product designs indicates a trade dress is non-functional. *See
Logan*, 2003 WL 21011746, at *4 ("[I]t is appropriate at [the preliminary injunction] stage to
consider the existence of alternative designs in the marketplace when determining whether
product features are functional."). As noted above, alternate and non-infringing designs are not
just available, but are in wide use in the marketplace. (Decl. Yoon ¶ 46.) Ty itself sells, in fact,
numerous lines of plush toys that do not co-opt the Squishmallows Trade Dress. (*Id*. ¶ 43.) It
cannot reasonably be disputed as a result that ample alternate designs are available. *See Bodum*,
927 F.3d at 493 (concluding that "ample evidence" exists of alternate designs where both
litigants manufactured products with different design elements).

The shape, appearance, texture, and feel of the Squishmallows plush toys are all aesthetic
features as to which there are innumerable alternatives. (Decl. Yoon ¶¶ 42–44.) Kellytoy
designed the Squishmallows shape, appearance, texture, and feel to distinguish the
Squishmallows from other toys. (Decl. Yoon ¶ 9.) There are also numerous alternative designs
in the marketplace that abstractly depict animals and other creatures – without discrete heads and
torsos and without proportionate limbs – that do not infringe upon the Squishmallows Trade
Dress. While they possess some of the elements of the Squishmallows Trade Dress, they
critically differ in shape and thus avoid infringement. (*See* Decl. Yoon ¶¶ 42–44 for examples.)

        e.    *The Squishmallows Trade Dress does not affect quality or costs*

Kellytoy did not select the features of the Squishmallows Trade Dress for purposes of

increasing quality or reducing costs.  Kellytoy could have, as noted, chosen alternative designs that are less expensive to produce.  (Decl. Yoon ¶¶ 11-12.)  Kellytoy uses an ultra-silky polyester fill for the Squishmallows stuffing, for example, and alternate fillings are available for stuffed toys that are less expensive, such as regular polyester stuffing and 3D light weight stuffing.  (*Id*.)  Likewise, Kellytoy could have chosen ways to depict nostrils, mouths, and other features that are less expensive than embroidering those features.  (*Id*.)  Less expensive alternatives to embroidery include printing and sublimation printing.  (*Id*.)  The short-pile velvety velour-like textured exterior provides no cost savings.  Other less expensive available exterior materials include Tricot, EF Velboa and Velboa.  (*Id*.)  And Ty, for its part, could have selected any number of alternatives designs that would have worked equally well from a cost of goods and ease of manufacture standpoint but would not have provided the overall look and appearance that Kellytoy sought for its Squishmallows plush toy line.  (*Id*.)  The same holds true for the Squishmallows egg/bell shape.  That shape provides no manufacturing cost savings; other shapes such as squares, circles, triangles are equally, or less, expensive to manufacture.  (*Id*.)

3. <strong><u>Customers are likely to be Confused</u></strong>

A defendant's product infringes the plaintiff's trade dress if the plaintiff shows that similarity of the defendant's trade dress to that of the plaintiff's creates a likelihood of confusion on the part of consumers as to the source of the goods.  15 U.S.C. § 1125; *Badger*, 13 F.3d at 1151; *Top Tobacco v. Fantasia Distribution Inc.*, 101 F. Supp. 3d 783, 788 (N.D. Ill. 2015).

Courts in the Seventh Circuit consider seven factors when analyzing the likelihood of confusion: (1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of the plaintiff's mark; (6) actual confusion; and (7) intent of the defendant to "palm off" his product as that of another.  *Top Tobacco*, 101 F. Supp. 3d at 789 (citing *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 643 (7th Cir. 2001)).  No single factor is dispositive, and a plaintiff need not allege facts for all factors.  (*See id*.)  The weight a court assigns to any factor will depend on the facts and circumstances of the case.  *See Ty*, 237 F.3d at 898 (affirming preliminary injunction obtained by maker of beanie baby plush toys).

a. *The Squishmallows Trade Dress and the Infringing Plush are similar in appearance and suggestion*

The first factor weighs in favor of a likelihood of confusion if the plaintiff's and the defendant's products outwardly are similar in appearance. *See Badger*, 13 F.3d at 1152. Here, the Infringing Plush toys are outwardly similar in appearance to Squishmallows. As can be readily seen from an inspection of the Infringing Plush, the Infringing Plush contain all of the visual elements of the Squishmallows Trade Dress, including the overall bell/egg shape without distinct heads and torsos, both depict animals/creatures without proportionate and pronounced appendages; abstract, Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics and embroidered facial features; and contrasting and non-monochrome coloring. (Decl. Mizrahi, Ex. I.) One can also tell through visual inspection and that the Infringing Plush contain a very soft, short pile outer shell similar to the Squishmallows. (*Id.*) As can readily inferred from the name assigned by Ty to the Infringing Plush, namely, Squish-a-Boos, that they possess a mooshy filling. (*Id.*) A buyer who had access to Ty's Squish-a-Boos during a recent tradeshow confirmed to Kellytoy that the Infringing Plush possess a similar shell material and "mooshy" feel reasonably Squishmallows. (Decl. Rauch ¶ 3.) Mr. Gottlieb puts the question to rest, opining that when coupled "with a sounds-like name, Squish-A-Boo, makes for a product that consumers will easily confuse with the Squishmallows product." (Decl. Gottlieb ¶ 22.)

Significantly, Mr. Gottlieb confirms that Ty took the features that distinguish the Squishmallows line from the goods of others (e.g., the shape, the lack of limbs, and the abstract features) and incorporated them into the Infringing Plush. (Decl. Gottlieb ¶ 19.)

Nonetheless, to the extent the products may contain minor differences, such as Ty using larger eyes, those differences do not defeat the likelihood of confusion because the courts, in analyzing similarity, do not consider the products side-by-side, but instead consider the conditions of the marketplace. *See Ty*, 237 F.3d at 899; *Int'l Kennel Club*, 846 F.2d at 1088; *see also Malletier v. Burlington Coat Factory Warehouse Corp.*, 426 F.3d 532, 537 (2nd Cir. 2005) (reversing denial of preliminary injunction because district court compared the products side-by-side rather than considering the market conditions).

Here, consumers are unlikely to distinguish between genuine Squishmallows and the Infringing Plush based on the larger eyes or other minor differences. As discussed more below, the target customer for Squishmallows are children between 5 and 14. (Decl. Gottlieb ¶ 23.) Those children are unlikely to remember the details of the product, aside from the general look and feel, and they might request Squishmallows from their parents, who later purchase the products without the children present. The parents may not be aware of the minor differences between Squishmallows and the Infringing Plush.

Even if consumers later notice differences between Squishmallows and the Infringing Plush, "[i]nitial interest confusion, which is actionable under the Lanham Act, occurs when a customer is lured to a product by the similarity of the mark, even if the customer realizes the true source of the goods before the sale is consummated." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002), as amended (Oct. 18, 2002). The similarities discussed above allow Ty to profit from customers' initial interest confusion.

          b.   *Squishmallows and the Infringing Plush are similar goods*

The plaintiff's and defendant's products are considered similar in type if the buying public would reasonably think they come from the same source, or are affiliated with, connected to, or sponsored by, the same source. *Ty*, 237 F.3d at 900; *Top Tobacco*, 101 F. Supp. 3d at 790; *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1015 (N.D. Ill. 2014). For example, the public may presume products come from the same source when "the objects are similar in that they are small stuffed objects that are soft, pellet-filled, eight to nine inch plush toys made from velboa-type fabric." *Ty*, 237 F.3d at 899–900. This factor is further supported if the plaintiff and defendant are in the same industry. *Top Tobacco*, 101 F. Supp. at 790.

In this case, the Infringing Plush and the Squishmallows comprise the same types of goods. As described above, Squishmallows and the Infringing Plush are both similar sized plush toys, of similar shape and feel, and marketed to the same consumers. Thus, this factor further supports the conclusion that the buying public is likely to think Squishmallows and the Infringing Plush are associated or originate from a common source.

       c.    *Squishmallows and the Infringing Plush are sold in the same area*

For the third factor, courts consider the products' geographical areas of distribution; whether the products directly compete with each other; whether products are sold to consumers in the same type of store; and whether the products are sold through the same marketing channels. *Top Tobacco*, 101 F. Supp. 3d at 790–91. Facts supporting the third factor include both products being advertised nationwide (*KJ Korea*, 66 F. Supp. 3d at 1016); that both products being sold in the same city (*id.*); both products being sold in the same type of retail stores or same sections of stores (*Top Tobacco*, 101 F. Supp. 3d at 791). The area and manner of concurrent use favors a finding of likelihood of confusion if the products directly compete for customers. *See Badger*, 13 F.3d at 1152.

Squishmallows and the Infringing Plush are sold in the same area. In fact, Squishmallows are sold in hundreds of retailers nationwide, including the largest retailers in the country, such as Walgreens, Fred Meyer, Kroger, and CVS, among others, many of the same nationwide retailers through which Ty has historically sold its plush toys. (Decl. Yoon ¶¶ 22, 31.) Squishmallows and the Infringing Plush have even appeared at the same trade show, the Atlanta International Gift & Home Furnishings Market. (*See* Declaration of Andrew J. Rauch ("Decl. Rauch") ¶ 3.) Kellytoy is also informed that Ty intends to display the Infringing Plush at Toy Fair New York, scheduled to take place February 22–25, 2020, considered the most important and most attended tradeshow in the United States. (*See* Decl. Yoon ¶ 334) This factor, too, weighs in favor of a finding of "likelihood of confusion."

       d.    *The consumer's degree of care*

Although people of all ages purchase Squishmallows, the target customers are children between 5 and 14. (Decl. Gottlieb ¶ 23.) While children can be expected to recall the overall "look and feel" of a product or product line, one outside of the presence of such toys, children are unlikely to remember the fine details of the product. (*Id.*) Moreover, the children often request toys from their parents, who in many cases later purchase the products without the children present. (*Id.*) The parents may not be aware of the minor differences between Squishmallows and the Infringing Plush. Moreover, Squishmallows are not expensive, generally

ranging from $2.99 to $19.99, and are frequently impulse buys. (Decl. Yoon ¶ 38.) The more widely advertised, accessible and inexpensive the products, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases. *See Cae, Inc. v. Clean Air Engineering, Inc.*, 267 F. 3d 660, 683 (7th Cir. 2001). These factors, according to Mr. Gottlieb, increase the likelihood of consumer confusion. (Decl. Gottlieb, ¶ 24.)

e. *The Squishmallows Trade Dress is strong*

To determine the strength of the plaintiff's trade dress, courts "examine the distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the mark as emanating from a particular source." *Top Tobacco*, 101 F. Supp. 3d at 791. Relevant evidence includes the amount of advertising and the amount of sales. *See id.*; *KJ Korea,* 66 F. Supp. 3d at 1016.

Here, the Squishmalows Trade Dress is strong for all the reasons described above. Indeed, the evidence assembled and recited in demonstrating that these goods have attained secondary meaning establishes, by corollary, the obvious strength of the Trade Dress and its resonence with the consuming public. *See supra.* Finally, to maintain its strength, Kellytoy has vigorously protected it in the marketplace against infringements via multiple lawsuits (not to mention disputes resolved through demand letters). (Decl. Mizrahi ¶ 4.)

f. *Actual confusion*

"Although evidence of actual confusion, if available, is entitled to substantial weight in the likelihood of confusion analysis, this evidence is not required to prove that a likelihood of confusion exists." *KJ Korea*, 66 F. Supp. 3d at 1016. A lack of evidence of ***actual*** confusion is not dispositive of the ***likelihood*** of confusion, and a plaintiff need no introduce, for example, a market survey evidencing likelihood of confusion. *Top Tobacco*, 101 F. Supp. 3d at 792 (citing *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 685 (7th Cir. 2001)); *see also Badger*, 13 F.3d at 1153. Here, Ty's infringing goods have not yet been released for general public sale, and thus no evidence of actual confusion can or could be available. That said, Kellytoy already has direct evidence demonstrating that actual confusion almost certainly will ensue if Ty's products are permitted to go to market. Specifically, Andrew Rauch, a Kellytoy Vice-President, testifies by

4436524.4                                          21

way of his Declaration that a Kellytoy customer (i.e., a retail buyer) informed him on January 15, 2020 – while attending a trade show in Atlanta – that Ty was selling or promoting products "very similar" to Squishmallows. (Decl. Rauch ¶ 3.) The import of that testimony is clear – if a Kellytoy customer/buyer is taking the time to identify the similarity of these goods to Kellytoy, before Ty's infringing goods are in release, subsequent and actual customer confusion is a practical inevitability if Ty ultimately releases its products on a widespread basis.

g.    *Ty intended to palm off its products as Squishmallows*

Ty has a history in the toy market of entering after a market is established and competing with confusing products. Rather than innovate, Ty looks to competitors for new product ideas and, in many cases, undercuts the pricing for the originals and used its well-established distribution network and significant capital to establish itself as the market leader for its knockoff products – essentially drowning out the originals in the marketplace. (Decl. Yoon ¶ 53.) By way of example, a competitor created the Jellycat® Pom Poms toy, and Ty copied the look and feel with a toy under its Beanie Boo line, as depicted in the Yoon declaration. (*Id*. ¶¶ 55-56.) A competitor created the YooHoo & Friends toys, and Ty copied the look and feel under its Beanie Boos line, as depicted in the declaration. (*Id*. ¶¶ 57-58.) A competitor created the Tsum Tsum toy, and and Ty copied the look and feel with a toy under its Teeny Tys line, as depicted in the declaration. (*Id*. ¶ 59.) Thus, Ty intended to enter the market that Kellytoy established for Squishmallows and trade of the Squishmallows good will.

**C.    Kellytoy Will Suffer Irreparable Harm Absent A Preliminary Injunction**

The Seventh Circuit has "clearly and repeatedly held that damage to a trademark holder's goodwill can constitute irreparable injury for which the trademark owner has no adequate legal remedy." *Luxottica USA LLC v. P'ships & Unincorporated Ass'ns Identified on Schedule "A,"* 2015 WL 3818622 (N.D. Ill. 2015), citing *Re/Max N. Cent., Inc. v. Cook*, 272 F.3d 424, 432 (7th Cir. 2001). Irreparable injury "almost inevitably follows" when there is a high probability of confusion because such injury "may not be fully compensable in damages." *Helene Curtis Industries, Inc. v. Church & Dwight Co., Inc.*, 560 F.2d 1325, 1332 (7th Cir. 1977) (citation omitted).

If a preliminary injunction is not granted, Kellytoy will suffer loss for which there is no adequate remedy at law because: (1) Ty's infringement connects the Infringing Plush to genuine Squishmallows by causing consumer confusion regarding source and affiliation; (2) Kellytoy has no control over the manufacturing or quality control of the Infringing Plush – therefore, any quality problems related to Ty's products would be attributed to Kellytoy, resulting in damaged goodwill and undetectable lost sales; and (3) the ongoing advertising and sale of the Infringing Plush by Ty decreases the distinctiveness of the Squishmallows Trade Dress.

As detailed above, Kellytoy has made substantial investment in – and succeeded in – establishing its significant reputation and goodwill in its Squishmallows Trade Dress. In the absence of an injunction, Kellytoy will lose the value of that investment. The net result will be damage to Kellytoy in the form of lost profits and business opportunities, which amount cannot be measured or compensated by monetary damages alone. Further, unabated infringement will encourage others to use Kellytoy intellectual property without a license.

In addition, Ty has hijacked that reputation to sell competing products over which Kellytoy has no control. Trademarks identify their owners and in them resides the reputation and goodwill of their owners. Thus, if Ty is permitted to infringe upon the Squishmallows Trade Dress, Ty is borrowing Kellytoy's reputation for its own goods, whose quality no longer lies within Kellytoy's control. A trademark owner's loss of the ability to control its mark, thus, creates a high likelihood for damage to its reputation. "The most corrosive and irreparable harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods." *Int'l Kennel Club*, 846 F.2d at 1092.

Kellytoy employs rigorous quality controls over its Squishmallows. (Decl. Yoon ¶ 29.) But Kellytoy has no control over the quality of Ty's directly competitive Infringing Plush. Quality control does not solely relate to durability, but also to aesthetics. As close as Ty's designs are to Kellytoy's authentic Squishmallows designs, Kellytoy would never release Squishmallows bearing Ty's specific designs: they do not comport with the Squishmallows aesthetic. (Decl. Yoon ¶ 50.)

There is also the issue of safety. Plush toys are most often provided to children. If

something untoward were to occur in connection with Ty's Infringing Plush, such "bad will" would likely be imputed to Kellytoy's Squishmallows. Once there is a safety scare concerning a product, in the age of social media and the Internet, news in the marketplace spreads like wildfire often without the measured reflection necessary to properly distinguish Ty's Infringing Plush from Kellytoy's Squishmallows. The fact that Kellytoy is powerless over the design and quality of the Infringing Plush further supports a finding of irreparable harm.

    **D.**    **The Irreparable Harm to Kellytoy Outweighs The Potential Harm Ty Would Suffer Were A Preliminary Injunction Wrongfully Granted**

Comparatively, the potential harm to Ty is insignificant. First, Ty will simply be prevented from willfully infringing Kellytoy's Squishmallows Trade Dress and from trading on Kellytoy's goodwill – actions Ty never had the right to do in the first place. *See Ty*, 237 F.3d at 903 (When assessing the harm to the alleged infringer, "the court excludes the burden it voluntarily assumed by proceeding in the face of known risk.") In fact, Ty's wrongful conduct towards Kellytoy is part of its modus operandi in the marketplace, where it has done the same thing to others. (Decl. Yoon ¶¶ 53-59.) It should not be allowed to succeed, again, here.

Second, Ty, in contrast to Kellytoy, is a newcomer to the market with its Infringing Plush, without an established market position and brand strength. An injunction barring Ty from violating the Squishmallows Trade Dress will not substantially impede Ty's ability to do business. It could simply change the design of the Infringing Plush – which, to Kellytoy's knowledge, has not yet been distributed to Ty's customers. Kellytoy wrote to Ty on January 16, 2020 informing it of Kellytoy's claims to the Squishmallows Trade Dress; to the extent that Ty continued to invest in the Infringing Plush and take orders therefor, it should only have itself to blame. (Decl. Mizrahi ¶ 5.) Regardless, Ty will not be put out of business: Ty sells numerous other successful lines of plush toys and can continue to sell those to its customers – it simply cannot infringe on the Squishmallows Trade Dress. This balance, in short, favors granting injunctive relief. *See Ty*, 132 F.3d at 1172.

    **E.**    **The Public Interest Will be Served By Granting the Injunction**

The public interest will be served by granting Kellytoy's request for a preliminary

injunction, as it will prevent consumer confusion. *Eli Lilly & Co. v. Natural Answers, Inc.*, 233 F.3d 456, 469 (7th Cir. 2000) ("[T]he public interest is served by the injunction because enforcement of the trademark laws prevents consumer confusion."). Indeed, the gravamen of trademark protection is the right of the public to be free of confusion, along with the right of the trademark owner to control its reputation and its products' reputation; therefore, preventing Ty from infringing the Squishmallows Trade Dress and other of Kellytoy's rights promotes the interests of the public. *See id.* Granting of the requested injunction is in the public's interest.

### F. **Injunction Bond**

The amount of the security bond under Federal Rule of Civil Procedure 65(c) is in the discretion of the Court. *See Scherr v. Volpe*, 466 F.2d 1027, 1035 (7th Cir. 1972). The Seventh Circuit has determined that a strong likelihood of success is a major factor which could weigh heavily in favor of waiving a bond requirement. *Id.* Because of the strong and unequivocal nature of Kellytoy's evidence of trade dress infringement, and the fact that Ty will retain possession of its inventory and thus could sell it at a later date, Kellytoy asks this Court to require Kellytoy post a bond of no more than ten thousand U.S. dollars ($10,000.00). *See, e.g., Deckers Outdoor Corporation v. The Partnerships, et al.*, 2013 WL 1337616 (N.D. Ill. March 27, 2013) (setting $10,000 bond).

## IV. **CONCLUSION**

For the reasons set forth above, Kellytoy asks this Court to grant the Motion, enter the proposed order submitted to the Court, and enjoin Ty from selling, offering to sell, causing to be sold, disseminating, importing, distributing, circulating, promoting, marketing, advertising, or in any way commercially exploiting the Infringing Plush within the United States.

Dated: February 21, 2020        Respectfully submitted,

By:    */s/ Dean D. Niro*

    Dean D. Niro
    Oliver D. Yang
    VITALE, VICKREY, NIRO, SOLON &
    GASEY LLP
    311 S. Wacker Dr., Suite 2470
    Chicago, IL 60606
    Telephone: (312) 236-0733

dniro@vvnlaw.com
oyang@vvnlaw.com

Todd M. Lander (*pro hac pending*)
Mark B. Mizrahi (*pro hac pending*)
FREEMAN, FREEMAN & SMILEY, LLP
1888 Century Park East, Suite 1500
Los Angeles, CA 90067
Telephone: (310) 255-6100
Facsimile:     (310) 255-6200
todd.lander@ffslaw.com
mark.mizrahi@ffslaw.com

Attorneys for Plaintiffs
KELLYTOY WORLDWIDE, INC. and
KELLYTOY (USA), INC.