**THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., | ) ) ) | **CONTAINS CONFIDENTIAL INFORMATION** |
| Plaintiffs. | ) ) | Case No. 1:20-cv-00748 |
| v. | ) ) | Hon. Gary Feinerman |
| TY INC. and DOES 1-10 | ) ) | Magistrate Judge Susan E. Cox |
| Defendants. | ) ) | |

**TY'S MEMORANDUM IN OPPOSITION TO
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

J. Aron Carnahan
Don J. Mizerk
Michael D. Hayes
Laurie A. Haynie
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Direct: 312.526.1612
Fax: 312.655.1501
aron.carnahan@huschblackwell.com
don.mizerk@huschblackwell.com
michael.hayes@huschblackwell.com
laurie.haynie@huschblackwell.com

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

ABBREVIATIONS USED .................................................................................. vi

INTRODUCTION ................................................................................................. 1

ARGUMENT ......................................................................................................... 3

I.     Kellytoy Is Not Entitled To A Preliminary Injunction. ......................... 3

II.    Kellytoy Has Not Made A "Clear Showing" That It Is Likely To Succeed On The Merits Of Its Trade Dress Claim ................................................... 3

    A.    Kellytoy Does Not Own Valid Trade Dress Rights .................................... 4

        1.    The Claimed Trade Dress Is Generic and Hence Unprotectable ........................................................................... 4

            a.    Kellytoy's Trade Dress Definition is Overbroad and Too Generalized. ................................................. 5

            b.    Third Parties (Including Ty) Have Extensively Used The Claimed Trade Dress. ........................... 7

        2.    The Claimed Trade Dress Is Not Present In The Entire Product Line ................................................................. 10

    B.    Kellytoy Has Failed To Establish Its Claimed Trade Dress Is Nonfunctional ........................................................................ 11

    C.    Kellytoy Has Not Shown Secondary Meaning In Any Trade Dress ........ 16

    D.    There Is No Likelihood of Confusion Here. ............................................. 22

III.    Kellytoy's Factually Baseless Arguments Are Legally Insufficient To Show Irreparable Harm Or An Inadequate Remedy at Law ................................ 27

IV.    The Irreparable Harm to Ty and to the Public Greatly Outweighs Kellytoy's Claimed Irreparable Harm. ................................................... 29

V.    Security for Any Injunction Should Be Set For At Least ███████ .................. 30

CONCLUSION ................................................................................................... 30

i

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*Abercrombie & Fitch Stores, Inc. v. Amer. Eagle Outfitters, Inc.,*
280 F.3d 619 (6th Cir. 2002) ..................................................... 5

*AM General Corp. v. DaimlerChrysler Corp.,*
311 F.3d 796 (7th Cir. 2002) ..................................................... 10, 27, 30

*Arlington Specialties, Inc. v. Urban Aid, Inc.,*
847 F.3d 415 (7th Cir. 2017) ..................................................... 3, 15

*Aurora World, Inc. v. Ty Inc.,*
719 F.Supp.2d 1115 (C.D. Cal. 2009) ..................................................... 6, 14, 15, 25

*Bodum USA, Inc. v. A Top New Casting Inc.,*
927 F.3d 486 (7th Cir. 2019) ..................................................... 4, 15

*Continental Lab. Prods., Inc. v. Medax Int'l, Inc.,*
114 F. Supp. 2d 992 (S.D. Cal. 2000) ..................................................... 18, 19, 20, 26

*Devan Designs, Inc. v. Palliser Furniture Corp.,*
1992 WL 511694 (M.D. N.C. 1992), *aff'd*, 998 F.2d 1008 (4th Cir. 1993) ..................................................... 18

*eBay Inc. v. MercExchange, LLC,*
547 U.S. 388 (2006) ..................................................... 28

*EFS Mktg. v. Russ Berrie & Co.,*
76 F.3d 487 (2nd Cir. 1996) ..................................................... 22

*Fashion Victim, Ltd. v. Sunrise Turquoise, Inc.,*
785 F.Supp. 1302 (N.D. Ill. 1992) ..................................................... 5

*Ferrari S.P.A. v. Roberts,*
944 F.2d 1235 (6th Cir. 1991) ..................................................... 15

*Fils S.A. v. J. Young Enters., Inc.,*
644 F.2d 769 (9th Cir. 1981) ..................................................... 12

*Fisons Horticulture, Inc. v. Vigoro Indust.,*
30 F.3d 466 (3rd Cir. 1994) ..................................................... 18

*Foodcomm Int'l v. Barry,*
328 F.3d 300 (7th Cir. 2003) ..................................................... 28

*Georgia-Pacific Consumer Prods. LP v. Kimberly–Clark Corp.,*
647 F.3d 723 (7th Cir. 2011) ..................................................... 12, 13

*Global Mfg. Group, LLC v. Gadget Universe.Com*,
  417 F.Supp.2d 1161 (S.D. Cal., 2006) ...................................................................... 17

*Gray v. Meijer, Inc.*,
  295 F.3d 641 (6th Cir. 2002) ................................................................................. 24

*In re Koninklijke Philips Elecs. N.V.*,
  2014 WL 5035509 (T.T.A.B. 2014) ......................................................................... 17

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
  400 F.3d 1007 (7th Cir. 2005) ................................................................................. 4

*Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*,
  4 F.3d 819 (9th Cir. 1993) .................................................................................... 30

*Int'l Market Brands v. Martin Intern. Corp.*,
  882 F. Supp. 2d 809 (W.D. Pa. 2012) ...................................................................... 23

*Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*,
  58 F.3d 27 (2d Cir. 1995) ....................................................................................... 5

*Kellytoy USA Inc. v. Dan-Dee Int'l, Ltd.*,
  No. CV 18-05399 JAK (C.D. Cal. Feb. 7, 2019) ........................................................ 6

*Kendall-Jackson Winery Ltd. v. E. & J Gallo Winery*,
  150 F.3d 1042 (9th Cir. 1998) ................................................................................. 9

*Keystone Camera Prods. Corp. v. Ansco Photo-Optical Products Corp.*,
  667 F.Supp. 1221, 1230 (N.D. Ill. 1987) ................................................................. 14

*Kohler Co. v. Honda Giken Kogyo K.K.*,
  125 U.S.P.Q.2d 1468, 2017 WL 6547628 (T.T.A.B. 2017) ....................................... 19

*Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*,
  735 F.3d 735 (7th Cir. 2013) ........................................................................... 27, 29

*Libman Co. v. Vining Indus., Inc.*,
  69 F.3d 1360 (7th Cir. 1995) ...................................................................... 1, 21, 22

*Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*,
  292 F.Supp.2d 535 (S.D.N.Y. 2003) ...................................................................... 11

*Malaco Leaf, AB v. Promotion in Motion, Inc.*,
  287 F.Supp.2d 355 (S.D.N.Y. 2003) ........................................................................ 9

*Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*,
  65 F.3d 1063 (2nd Cir. 1995) ................................................................................. 17

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ............................................................................................... 3

iii

*McDonald's Corp. v. Burger King Corp.*,
  107 F.Supp.2d 787 (E.D.Mich. 2000) .................................................................... 18

*Mead Johnson & Co. v. Abbott Labs.*,
  201 F.3d 883 (7th Cir.), *am. on den. of reh'g*, 209 F.3d 1032 (2000) ..................... 30

*Milbank Tweed Hadley & McCloy LLP v. Milbank Holding Corp.*,
  2007 WL 1438114 (C.D. Cal., 2007) .................................................................... 19

*Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*,
  No. 14 C 7424, 2015 U.S. Dist. LEXIS 74700 (N.D. Ill. June 10, 2015) ............... 28

*National Lighting Co., Inc. v. Bridge Metal Indus., LLC*,
  601 F. Supp. 2d 556 (S.D. N.Y. 2009) .................................................................. 11

*P.F. Cosmetique, S.A. v. Minnetonka, Inc.*,
  605 F. Supp. 662 (S.D.N.Y. 1985) ........................................................................ 24

*Phoenix Entm't Partners v. Rumsey*,
  829 F.3d 817 (7th Cir. 2016) ................................................................................... 4

*Rachel v. Banana Republic, Inc.*,
  831 F.2d 1503 (9th Cir. 1987) ............................................................................... 14

*Roederer v. J. Garcia Carrion, S.A.*,
  93 U.S.P.Q.2d 1584 (D. Minn. 2010) .................................................................... 23

*Roulo v. Russ Berrie & Co.*,
  886 F.2d 931 (7th Cir. 1989) ................................................................................... 6

*Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*,
  668 F.3d 677 (9th Cir. 2012) ........................................................................... 10, 15

*Sorenson v. WD-40 Co.*,
  792 F.3d 712 (7th Cir. 2015) ................................................................................. 27

*Specialized Seating, Inc. v. Greenwich Indus., LP*,
  616 F.3d 722 (7th Cir. 2010) ................................................................................. 12

*Spraying Sys. Co. v. Delavan, Inc.*,
  975 F.2d 387 (7th Cir. 1992) ................................................................................. 19

*Thomas & Betts Corp. v. Panduit Corp.*,
  138 F.3d 277 (7th Cir. 1998) ................................................................................. 16

*Thomas & Betts Corp. v. Panduit Corp.*,
  65 F.3d 654 (7th Cir. 1995) ......................................................................... 4, 16, 17

*TrafFix Devices, Inc. v. Mktg. Displays, Inc.*,
  532 U.S. 23 (2001) ....................................................................................... 4, 11, 24

iv

*Valencia v. City of Springfield*,
883 F.3d 959 (7th Cir. 2018) ...................................................................... 29

*Versa Prods. Co. v. Bifold Co.*,
50 F.3d 189 (3d Cir. 1995) ............................................................. 25, 27, 28

*Vision Sports, Inc. v. Melville Corp.*,
888 F.2d 609 (9th Cir. 1989) .................................................................... 20

*Walker & Zanger, Inc. v. Paragon Indus., Inc.*,
549 S.Supp.2d 1168 (N.D. Cal. 2007) ........................................... 5, 6, 7, 9

*Wal-Mart Stores v. Samara Bros.*,
529 U.S. 205 (2000)................................................................................ 3, 16

*Whitaker v. Kenosha Unified Sch. Dist. No. 1*,
858 F.3d 1034 (7th Cir. 2017) .................................................................. 27

*Winter v. Natural Resources Defense Council, Inc.*,
555 U.S. 7 (2008)......................................................................................... 3

*Yurman Design, Inc. v. PAJ, Inc.*,
262 F.3d 101 (2d Cir. 2001) ............................................................... 10, 22

**Statutory Authorities**

15 U.S.C. § 1125 ............................................................................... 3, 11

**Rules and Regulations**

Fed. R. Civ. P. 12 ........................................................................................ 6

Fed. R. Civ. P. 65 ...................................................................................... 30

**Other Authorities**

1 J. Thomas McCarthy, *McCarthy on Trademarks* § 8:15 (4th ed.).............................................. 24

1 McCarthy on Trademarks and Unfair Competition § 8:5.50 (5th ed.) ...................................... 10

4 Anne Gilson Lalone, Gilson on Trademarks § 14.02[D] (Matthew Bender) ........................... 28

## ABBREVIATIONS USED

| | |
|---|---|
| Br. | Plaintiff Kellytoy Worldwide, Inc.'s Memorandum of Law in Support of its Motion for Preliminary Injunction, Dkt. No. 21, filed 2/21/20 |
| Compl. | Complaint, Dkt. No. 1 filed 1/31/20 |
| Dalhart Dec. | Declaration of Glenn Dalhart, filed herewith |
| Gottlieb Dec. | Declaration of Richard Gottlieb, Dkt. No. 22, filed 2/21/20 |
| Johnson Dec. | Declaration of Chris Johnson, filed herewith |
| Kellytoy | Plaintiff Kellytoy Worldwide, Inc. |
| Lundeen Dec. | Declaration of Tania Lundeen, filed herewith |
| McTigue Dec. | Declaration of Kevin McTigue, filed herewith |
| Norton Dec. | Declaration of Frank Norton, filed herewith |
| Ryan Dec. | Declaration of Deborah Ryan, filed herewith |
| Yoon Dec. | Declaration of Jeanne Yoon, Dkt. No. 24, filed 2/21/20 |

**INTRODUCTION**

Kellytoy asks this Court to grant it monopoly rights in pillow-type toys that (like most plush) are "soft," "squeezable," have "embroidered" facial features, "rounded" graphics and "contrasting" colors, all under the guise of a trade dress claim. Although Kellytoy actually owns copyrights that protect original design elements in its Squishmallows products, Kellytoy has <u>not</u> sued Ty for copyright infringement because no such claim can properly lie: the design elements in Ty's products come directly from Ty's already-popular Beanie Boos products (representative examples below), not Kellytoy's Squishmallows:

| Beanie Boos | Squish-a-Boos | Beanie Boos | Squish-a-Boos | Beanie Boos | Squish-a-Boos |
|---|---|---|---|---|---|
| Fantasia 2015 | Fantasia 2020 | Dotty 2016 | Dotty 2020 | Slush 2009 | Slush 2020 |

In an effort to get around the distinct dissimilarity of protectable design elements under copyright, Kellytoy seeks the exclusive rights to make pillow style plush with commonly-used design features by resorting to a claim under that the Lanham Act (a consumer protection statute directed at preventing confusion as to source). But the Lanham Act does not grant rights in gross to design features as argued by Kellytoy. "[A] trademark is not a property right, but an identifier; so, provided no one is likely to be confused by the alleged infringer, there is no impairment of the interest that the trademark statute protects." *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1361 (7th Cir. 1995). And, as previously acknowledged by Kellytoy in resolving a 1999 trademark dispute brought by Ty,[1] the prominent use of the famous TY HEART LOGO® on Ty's products (such as with the accused Squish-a-Boos here) eliminates any possibility of confusion:






| Kiki | Outside Hang Tag | Inside Hang Tag | Permanent Sewn-in Label |
|---|---|---|---|

---

[1] Appendix B, November 1999 Trademark Settlement Agreement between Kellytoy and Ty.

1

One federal court has already dismissed a similar trade dress claim brought by Kellytoy because the claimed trade dress was "too broad to form the basis of a plausible claim for trade dress infringement . . . ." Norton Dec. Ex. 12-B p. 9. This is the case here as well because, as explained by toy expert Deborah Ryan, Kellytoy's claimed trade dress describes an unprotectable idea that did not originate with Kellytoy; was adopted by a multitude of sellers before Squishmallows came out; and which permeates the market today. In this regard, a comparison of Ty's Baby Ballz® plush (launched *four years* before Kellytoy came out with the first Squishmallow) and corresponding Squishmallows toys debunks Kellytoy's assertion that it is the creator and exclusive source for its claimed trade dress:



**Ty's 2013 Baby Ballz (on far right and left) shown beside Kellytoy's later Squishmallow products (in center)**

In addition, the claimed trade dress features of Kellytoy's toys are functional and hence unprotectable because, among other things, they are essential to the goal of creating plush toys and constitute features which consumers desire in plush, such as soft exteriors, squeezability, use of contrasting colors, embroidered facial features, and "cute" characteristics.

Neither can Kellytoy show the requisite secondary meaning in its claimed trade dress, because, as explained by marketing expert Kevin McTigue, none of Kellytoy's advertising focuses on the specific claimed trade dress features in a manner that will cause consumers to associate the trade dress with a single source. The law governing trade dress is clear: no matter how popular or widely known, features of a product like Squishmallows do not acquire secondary meaning unless the "primary significance" of the trade dress in the minds of ordinary consumers is to identify it as a Kellytoy product, and there is no evidence to this effect.

The other preliminary injunction factors favor Ty because Ty will suffer significant financial harm and damage to its goodwill if an injunction is granted, and the public will be better served if Ty is permitted to sell its product. For these and other reasons, Kellytoy's attempt to obtain the drastic remedy of an injunction should be rejected.

## ARGUMENT

### I.     KELLYTOY IS NOT ENTITLED TO A PRELIMINARY INJUNCTION.

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis in original; citations omitted). A preliminary injunction is "never awarded as of right," and a plaintiff seeking such relief "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20, 24 (2008). Kellytoy has failed to make the requisite "clear showing" to justify the "extraordinary and drastic remedy" of a preliminary injunction under any of these elements. *Mazurek*, 520 U.S. at 972.

### II.     KELLYTOY HAS NOT MADE A "CLEAR SHOWING" THAT IT IS LIKELY TO SUCCEED ON THE MERITS OF ITS TRADE DRESS CLAIM.[2]

The Lanham Act "establishes a cause of action against 'any person who . . . in connection with any goods or services' uses 'any word, term, name, symbol, or device' which 'is likely to cause confusion' as to the good or service's source." *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 418 (7th Cir. 2017), quoting 15 U.S.C. § 1125(a)(1)(A). That protection can extend to "trade dress" such as "the design . . . of a product that is so distinctive as to identify the manufacturer or source." *Id*. The Supreme Court has cautioned that where, as here, the alleged trade dress is the product design itself, "consumer predisposition to equate the feature with the source does not exist." *Wal-Mart Stores v. Samara Bros.*, 529 U.S. 205, 213 (2000). Instead, consumers view even unusual product designs as something other than a designation of source: "Consumers are aware of the reality that, almost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing." *Id.*

---

[2]Kellytoy's claim that it need only prove a "better than negligible" chance of succeeding on the merits (Br. p. 6) is contrary to the Supreme Court's more recent pronouncement that that injunctive relief "may only be awarded upon a *clear showing* that the plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22. Whatever the standard, Kellytoy has not come close to meeting it.

Moreover, "[t]rade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as patent or copyright protects an item, it will be subject to copying." *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 29 (2001). Although Squishmallows are the subject of United States Copyright Registrations or pending applications (Norton Dec. Ex. 12-A p. 5), Kellytoy does not claim that Ty's products infringe Kellytoy's copyrights, doubtless because the protectable elements of the parties' products are not substantially similar. Indeed, "[t]he unauthorized copying of a creative work is typically the province of copyright law." *Phoenix Entm't Partners v. Rumsey*, 829 F.3d 817, 824 (7th Cir. 2016). Because there is no actionable similarity of original protected design elements under copyright, Kellytoy instead improperly claims exclusive ownership in the most basic features found in nearly all plush toys, such as softness, cuteness, squeezability, embroidered features, simple graphics, and contrasting colors as trade dress rights. This tactic is properly rejected here where Kellytoy cannot show protectable trade dress. *See Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 657–58 (7th Cir. 1995) ("Trade dress protection only extends to the role of such features as signifier of source; when competitors are barred from duplicating features whose value to consumers is intrinsic and not exclusively as a signifier of source, competition is unduly hindered.")

In order to establish trade dress infringement, Kellytoy must prove that it owns valid trade dress rights; its claimed trade dress is nonfunctional; its claimed trade dress has acquired secondary meaning; and a likelihood of consumer confusion exists between the claimed trade dress and the accused toys. *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 491 (7th Cir. 2019); *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1015 (7th Cir. 2005). Kellytoy has proven none of these elements.

### A.  Kellytoy Does Not Own Valid Trade Dress Rights

### 1.  The Claimed Trade Dress Is Generic and Hence Unprotectable

Trade dress does not exist in an idea or concept. Just as copyright law does not protect ideas but only their concrete expression, "neither does trade dress law protect an idea, a concept,

4

or a generalized type of appearance." *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32–33 (2d Cir. 1995). *See also Fashion Victim, Ltd. v. Sunrise Turquoise, Inc.*, 785 F. Supp. 1302, 1308 (N.D. Ill. 1992)(the legal protection afforded to trade dress "does not extend to an idea as such rather than to its embodiment . . . ."). A product design is considered "generic" and hence unprotectable if it is so common that it cannot identify any particular source. Indeed, "no designer should have a monopoly on designs regarded by the public as the basic form of a particular item." *Abercrombie & Fitch Stores, Inc. v. Amer. Eagle Outfitters, Inc.*, 280 F.3d 619, 638 (6th Cir. 2002). To determine whether a design is generic, courts will consider, for example, whether "the design's definition is overbroad or too generalized" or whether "the design is so common in the industry that it cannot be said to identify a particular source." *Walker & Zanger, Inc. v. Paragon Indus., Inc.*, 549 F. Supp. 2d 1168, 1176 (N.D. Cal. 2007). Kellytoy's claimed trade dress is generic for at least both of these reasons.

### a.    *Kellytoy's Trade Dress Definition is Overbroad and Too Generalized.*

Although Kellytoy is required to describe its claimed trade dress with detail and clarity, Kellytoy itself has difficulty articulating its own trade dress, stating that its trade dress is "not easily reduced to writing." Compl. ¶ 31. The trade dress elements articulated by Kellytoy include, for example:

- "substantially egg/bell shaped plush toys depicting various similarly shaped fanciful renditions of animals/characters" (Compl. ¶ 31); "a specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs" (Br. p. 3);

- "simplified Asian style Kawaii faces with repeating and complementary rounded/oval shaped graphics depicting features of the characters themselves (such as eyes, snouts and bellies) and which conform to support the overall egg/bell shape of the toys" (Compl. ¶ 31); "abstract, embroidered facial features based on the Japanese Kawaii style" (Br. p. 3); "oval/rounded graphic features" (*Id.*); "embroidered facial features, such [sic] nostrils, and/or mouths" (Compl. ¶ 31);

- "distinctive contrasting and non-monochrome coloring" (Compl. ¶ 31); "distinctive monochrome coloring" (Br. p. 9); and

- "short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel" (Compl. ¶ 31); "an ultra-soft shell and mooshy, silky stuffing, as more fully described in Paragraph 31 of the Complaint" (Br. p. 3).

Each of these claimed elements, taken alone or together, is so broad and vague as to constitute a general idea rather than a concrete embodiment of the idea, and cannot serve as a designator of source.[3] In fact, the Central District of California recently dismissed Kellytoy's similar trade dress claim against another party for this very reason: "This general description **offers little insight into the scope or nature of Kellytoy's claim**. . . . **It is also too broad to form the basis of a plausible claim for trade dress infringement**." Norton Dec. Ex. 12-B p. 9, emphasis added.[4] If Kellytoy's claimed trade dress is insufficient to overcome a Rule 12(b)(6) motion, it certainly cannot form the proper basis for a preliminary injunction here.

Kellytoy's recitation of purported trade elements here is "overbroad," and amounts to "empty generalities in the face of more precise alternatives," and should be rejected for the same reasons described by the court in *Walker & Zanger* when considering claimed trade dress in decorative tiles:

> [T]o describe the colors of the trade dress, plaintiff should list the actual colors rather than claim a "palette of colors reminiscent of Provence." Or instead of defining the three-dimensional relief as "complex," plaintiff should provide the magnitude and angle of relief that renders plaintiff's tiles distinctive. Finally, some terms leave the boundary of plaintiff's trade dress rights unclear, such as the terms "rustic look," "weathered look," "architectural character," or even "Old World handiwork." These terms fail to provide adequate notice to competitors in the decorative tile business regarding the breadth of plaintiff's exclusivity rights.

549 F.Supp.2d at 1176. These criticisms apply equally to Kellytoy's vague descriptions of its trade dress. To have protectable trade dress, Kellytoy must describe the actual colors it seeks to

---

[3] To the extent Kellytoy claims trade dress protection in "short-pile velvety velour-like textured exterior with a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel," these describe "tactile properties" that are not entitled to trade dress protection in any event. Trade dress protections extends to the "visual aspects of a product relating to its design or style," not the tactile properties that cannot be seen by the consumer. *Aurora World, Inc. v. Ty Inc.*, 719 F.Supp.2d 1115, 1141 (C.D. Cal. 2009). *See also Roulo v. Russ Berrie & Co.*, 886 F.2d 931, 935 (7th Cir. 1989)("'Trade dress' refers to the **total image** of a product . . . .") (emphasis added).

[4] In *Kellytoy USA Inc. v. Dan-Dee Int'l, Ltd.*, No. CV 18-05399 JAK (C.D. Cal. Feb. 7, 2019), Kellytoy described its trade dress as including "(1) substantially bell-shaped plush toys embodying fanciful renditions of animals/characters, (2) embroidered anime-inspired minimalist, whimsical facial features, (3) a velvety velour-like textured exterior, and (4) stuffing with a light 'marshmallow' memory foam-like texture." Norton Dec. Ex. 12-B p. 9. Kellytoy attempted to remedy this problem with a Second Amended Complaint, which was then subjected to another Motion to Dismiss on the same basis (ECF 57). The case settled before the Court could rule against Kellytoy on the same basis again.

protect rather than "distinctive contrasting and non-monochrome coloring;" should define precisely what specific artistic elements it claims to own rather than referring to some amorphous style of an entire country ("Japanese") or an ill-defined design subset ("Kawaii"); should describe the exact shapes and specific design of any "embroidered facial features" and "oval/rounded features" that make up its trade dress; and should give detailed criteria for the "velvety velour-like" fabric and "silky memory foam-like" stuffing used in the toys. Like the terms used by the plaintiff in *Walker & Zanger*, the terms used by Kellytoy "leave the boundaries of plaintiff's rights unclear" and "fail to provide adequate notice" to competitors like Ty "regarding the breadth" of its claimed rights, and should be rejected on this basis alone. *See id.* at 1176 ("[T]he motivation for requiring strict definition is that trade dress claims raise a potent risk that relief will impermissibly afford a level of protection that would hamper efforts to market competitive goods.")(citations omitted).

Indeed, toy expert Deborah Ryan, who has been involved in the design of at least 20,000 plush toys over some 25 years, also concluded that Kellytoy's claimed trade dress features are too vague to describe what a product with these features would actually look like. She also notes that Kellytoy's various descriptions of its trade dress in multiple lawsuits are inconsistent, adding to the uncertainty of what trade dress features are actually claimed. Ryan Dec. ¶¶ 58-66; Norton Dec. Ex. 12-D. For all of these reasons, the claimed trade dress is generic because it is overly broad.

>    **b.    *Third Parties (Including Ty) Have Extensively Used The Claimed Trade Dress.***

Kellytoy's claimed trade dress is also generic because the features were extensively used by Ty and others before Squishmallows were first sold. For instance, Ty sold plush toys with the claimed features as early as 2013. Ty's "Pinky" and "Bluey" Baby Ballz® are "egg shaped;" depict a "fanciful animal;" lack a "discrete head and torso;" lack "proportionate, pronounced limbs," feature repeating "rounded/oval shaped graphics" depicting "eyes, snouts and bellies;" feature "embroidered facial features" such as eyes, a nose and mouth; include "distinctive and contrasting non-monochrome coloring;" a "short-pile velvety velour-like textured exterior;" and a

"light stuffing" that gives the toys a "soft" and "squeezable" feel.  These earlier Ty products have the same elements Kellytoy's later toys:



Ty's Baby Ballz, 2013



Ty's Baby Ballz Beside Kellytoy's Later Squishmallows

Johnson Dec. ¶¶ 27, 39-40; Ryan Dec. ¶¶ 78-79. In fact, Ty began selling its related Beanie Ballz® line of plush products in 2011, which shared these same features, and the Hello Kitty Beanie Ballz even featured the kawaii-style design, shown below:

    

Ty Pickles, 2011 | Ty Flash, 2011 | Ty Bonsai, 2011 | Ty Tumbles, 2011 | Ty Hello Kitty, 2012

Johnson Dec. ¶¶ 33, 37, 43; Ryan Dec. ¶¶ 81-84.

Moreover, as explained in the expert report of Deborah Ryan, each of the claimed trade dress elements, either alone or combined, was prevalent in the U.S. toy market long before Kellytoy came out with its "trade dress," and such toys are still sold to date, including, for example, the following:

     

Molang 2016    Suikko Gurashi 2013    Pusheen 2015    Totoro 2016    Gudetama 2015    Noodoll Pre-2017

Ryan Dec. ¶¶3, 85-138, 146-148. Ms. Ryan explains that each of these toys (representing just one example from the respective product lines), predated Squishmallows and contains all of the trade dress elements to which Kellytoy claims exclusivity, including an egg/bell shape; simplified

8

kawaii faces; embroidered facial features; short-pile velvety texture; contrasting and non-monochromatic coloring; and memory foam-like stuffing. *Id.* Ms. Ryan also explains that kawaii toys and soft pillow-like, squishy-type products were trending before Kellytoy came out with its Squishmallows. *Id.* ¶¶ 34-35.

Additional third-party toys that pre-date Squishmallows and share these same characteristics, include the following (Ryan Dec. ¶¶139-145, 149-155):

    

Schrodinger's Cat Pre-2017   Squooshies 2017   Sago Minis 2017   Grumpy Cat 2015   Fiesta Owl 2012

Examples of third-party products that possess Kellytoy's claimed trade dress features are also found in Appendix C hereto. These facts not only repudiate Kellytoy's claims that its trade dress characteristics "are not found on other plush toys in the United States" (Br. p. 1), but they unequivocally refute the "expert" testimony of Mr. Gottlieb.

Courts have consistently concluded that third-party uses of claimed trade dress renders a particular design feature generic and hence not protectable. *See Kendall-Jackson Winery Ltd. v. E. & J Gallo Winery*, 150 F.3d 1042, 108 (9th Cir. 1998) (image of grape leaf on wine bottle had "become generic" because wine bottlers other than plaintiff "have long used grape leaves to decorate their labels."); *Malaco Leaf, AB v. Promotion in Motion, Inc*., 287 F.Supp.2d 355, 364 (S.D.N.Y. 2003) ("evidence of extensive third-party use" of gummy fish-shaped candy "supports a finding that the Swedish Fish design is generic."); *Walker & Zanger,* 549 F. Supp. 2d at 1176 (designs for decorative tiles were "generic" because they were used by several other competitors in the market to copy "styles that craftsmen have used for centuries."). Kellytoy was not the first to use these claimed features and is far from the only company on the market selling such products today. Kellytoy's bald assertion that consumers automatically assume that any product with these features must come only from Kellytoy is refuted by the fact that consumers have been exposed to such features from numerous plush manufacturers in the market for nearly a decade.

Extensive third-party use of the claimed trade dress features renders the trade dress generic and hence unprotectable for this reason as well.

Kellytoy cannot escape the conclusion that its trade dress is generic by asserting that it has combined otherwise unprotectable elements in a new or unique way, because, as shown above, even combined, these features describe a generic product. *See also Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115-118 (2d Cir. 2001) ("the fact that a trade dress is composed entirely of commonly used or functional elements might suggest that the dress should be regarded as unprotectable or 'generic' to avoid tying up a product or marketing idea.") (citations omitted); *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co.*, 668 F.3d 677, 684 (9th Cir. 2012) (no trade dress protection where "the whole is nothing other than the assemblage of functional parts . . . .") (citations omitted).

### 2. The Claimed Trade Dress Is Not Present In The Entire Product Line

Kellytoy lacks a valid trade dress for the additional reason that Kellytoy asserts a trade dress in its entire line of Squishmallows (Br. pp. 2-3), yet the claimed features are lacking in all of its Squishmallows. "When it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:5.50 (5th ed.). As recognized by the Seventh Circuit:

> [o]ne claiming family trade dress protection **must articulate a specific trade dress** and **demonstrate that it has consistently used that trade dress**, and even then, "courts consider these broader product line claims with an 'acute' concern for protecting competition given that any remedy could potentially cover a wide range of products.

*AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814-15 (7th Cir. 2002)(emphasis added; citations omitted). As explained by Ms. Ryan, the claimed trade dress features are by no means present throughout the entire Squishmallows product line, which features, for example, different eyes, colors, fabrics, body shapes, and graphic elements, for example:



Ryan Dec. ¶¶ 45, 67-73. Indeed, Kellytoy's claimed trade dress has already been rejected by another court, because there were "substantial differences among the designs of the products in the Squishmallows line." Norton Dec. Ex. 12-B p. 9.

Because Kellytoy's claimed trade dress features are not present throughout its entire Squishmallows line, Kellytoy lacks a valid trade dress for this reason as well. *See Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 562 (S.D. N.Y. 2009) (dismissing trade dress claim in a line of lighting fixtures where "plaintiff was unable to identify which of the twelve listed design elements are consistent throughout the entire product line or how specifically the claimed trade dress incorporates those common elements."); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.*, 292 F.Supp.2d 535, 550 (S.D.N.Y. 2003) (no trade dress where plaintiff could not prove a reasonable consistency in a line of garments, whose design varied from product to product).

### B. Kellytoy Has Failed To Establish Its Claimed Trade Dress Is Nonfunctional

Because Kellytoy asserts infringement of a nonregistered trade dress it "has the burden of proving that the matter sought to be protected is not functional." *TrafFix*, 532 U.S. at 29; 15 U.S.C. §1125(a)(3). Kellytoy cannot show nonfunctionality here. A product feature will be deemed functional "if it is essential to the use or purpose of the article or affects the cost or quality of the article. . . . [A] functional feature is one the 'exclusive use of [which] would put competitors at a significant non-reputation-related disadvantage." *TrafFix*, 532 U.S. at 32 (citations omitted). Courts will also consider whether the feature at issue constitutes the actual

benefit that the consumer wishes to purchase, as distinguished from an assurance that a particular entity made, sponsored, or endorsed a product. *Vuitton et Fils S.A. v. J. Young Enters., Inc.*, 644 F.2d 769, 774 (9th Cir. 1981). A design is functional where a product "looks the way it does in order to be a better [product], not in order to be a better way of identifying who made it . . . ." *Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 727 (7th Cir. 2010). An analysis of the factors in *Georgia-Pacific Consumer Prods. LP v. Kimberly–Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011), demonstrates the functionality of each feature and the overall product.

*The Claimed Trade Dress Is Utilitarian and Kellytoy Advertises The Utilitarian Properties of Squishmallows*. Kellytoy itself admits that it advertises that Squishmallows "can be used as pillows . . . ." Br. p. 16. Indeed, as analyzed by Ty's marketing expert Kevin McTigue, a professor at Northwestern University's Kellogg School of Management with 20 years of experience working in the advertising and marketing industry for some of the world's most famous brands, the main messages communicated by Kellytoy's advertising campaign are softness/squeezability and collectability. McTigue Dec. ¶¶ 2, 4, 48. Kellytoy frequently advertises that its Squishmallows can be used as pillows, and this message is mentioned in dozens of marketing materials for the products. *Id*. ¶¶ 49-51 (the flagship website for Squishmallows touts the fact that "Since 2017, the Squishmallows . . have offered comfort, support and warmth as . . . **pillow pals**" and Kellytoy's CEO Jonathan Kelly also declared that Squishmallows can be used as pillows (among other things) in a news release about the toys: "Squishy and comforting, **they are great . . . pillows**.") (emphasis added). Since Squishmallows function as pillows, those aspects of the toys that render them useful as pillows are doubtless functional, including at least the egg/bell shape that lacks a discrete head and torso or pronounced limbs, the embroidered facial features (hard or plastic features would be too uncomfortable for a pillow), the short-pile, ultra-soft, velvety velour-like textured exterior, and the light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel (*see* Ryan Dec. ¶¶ 163, 166), so they cannot qualify as a valid trade dress. These same elements are also advertised as being washable—another functional feature. *Id*.; Compl. Ex. 5 p. 37. ("the unique line is made of super

soft marshmallow like texture and polyester. Caring for Squishmallows is easy: give them lots of love, wash in warm water and tumble dry on medium heat.").

Kellytoy also advertises the fact that Squishmallows serve the function of "offer[ing] comfort" and "helping to relieve stress and anxiety." McTigue Dec. ¶ 52 ("Since 2017, the Squishmallows™ . . . collections have **offered comfort, support and warmth** . . . .;" "**they are comforting companions and can be soothing for those with medical and sensory issues**."). These claims, along with statements about the "tactile appeal" of the toys and how the items assist those with sensory issues, have been repeated in numerous marketing materials for the toys, from Kellytoy and third parties. *Id.* ¶ 53. Thus, Kellytoy cannot claim trade dress rights in the aspects of the Squishmallows that help "relieve stress and anxiety," which extends to the entire claimed trade dress directed to soft, squishy products. And virtually every tag, package, display, and advertisement touts the functionality of the fact that the toys are "soft," "squishable" and "huggable," with the slogans like "SQUEEZE AND CUDDLE ME" (*id.* ¶ 54):

  

The Seventh Circuit has confirmed that "comfort" and "softness" are functional features. *Georgia-Pacific* affirmed summary judgment in favor of a trade dress defendant where plaintiff claimed trade dress in the "quilted diamond design" of its toilet paper. 647 F.3d at 732. The court noted that the language used in plaintiff's advertising 'links the quilted feature to numerous utilitarian benefits, such as softness, comfort and absorption' further affirming that the Quilted Diamond Design is functional." *Id.* at 730 (citations omitted). The characteristics of "softness" and "comfort" were also found to be claims of quality, and hence were functional under the Supreme Court's "affects the cost or quality" criteria. *See id.* at 728, 731. Just as "softness" and "comfort" affects the utilitarian advantages and quality of toilet paper, softness, comfort,

squishiness and squeezability affect the quality of plush pillow products, rendering these aspects of the claimed trade dress functional for this reason as well.

*The Difficulty in Creating Alternative Designs for the Item's Purpose, and the Effect of the Design Feature on an Item's Quality or Cost*. The claimed trade dress features of the toys are also functional under the fourth and fifth functionality factors because if each aspect of the claimed trade dress were protected trade dress, it would be virtually impossible for competitors to create alternative designs for the item's purpose, and the claimed design features affect the item's quality and cost. For example, Kellytoy claims as trade dress those elements of its plush that make the product resemble an animal, including "eyes, snouts and bellies," and "nostrils, and/or mouths." Compl. ¶ 31. However, "[f]unctional features of a product are features which constitute the actual benefit that the consumer wishes to purchase . . . ." *Rachel v. Banana Republic, Inc.,* 831 F.2d 1503, 1506 (9th Cir. 1987) (citations omitted). Features like "eyes, nostrils, ears, and noses" are "absolutely essential" to the purpose of creating animal or character figures and are therefore functional. *Id.* at 1507-08; s*ee also Aurora*, 719 F. Supp. 2d at 1147 ("a factfinder will likely conclude that the eyes of the toys are functional because they are essential to the goal of making the plush toys look like animals; this is because plush toys without eyes would not resemble their counterparts in nature."). For the same reasons, the asserted elements that are necessary to make Squishmallows resemble their counterparts in nature or a fanciful character (such as eyes, ears, snouts, bellies, nostrils, mouths, coloring, etc.) are functional and therefore cannot be protectable trade dress.

Kellytoy's claimed "distinctive contrasting and non-monochrome coloring" is also functional. The *Aurora* court noted that the "fanciful coloring of the toys" and the "overall design" of the plush toys in that case were "aesthetically functional" in that it is "the toys' aesthetic that drive the consumer to purchase them; this functionality exists independent of its source-identifying function." *Id*. at 1149. *See also Keystone Camera Prods. Corp. v. Ansco Photo-Optical Prods. Corp*., 667 F.Supp. 1221, 1225, 1230 (N.D. Ill. 1987) (claimed trade dress that included "unusual contrasting color combinations of bold colors" was functional: "Plaintiff attempts to monopolize as its trade dress the entire field of bold, popular contrasting colors. . . .

14

plaintiff's alleged trade dress consumes so much of the rainbow of available colors that trademark protection must be denied."). The same is true here.

Toy expert Deborah Ryan confirms that if features such as an egg/bell shape; Asian style kawaii faces with rounded/oval shaped graphics; abstract embroidered facial features; contrasting and non-monochrome coloring; short-pile, ultra-soft, velvety velour-like textured exterior; or a light and silky memory foam-like stuffing providing an extremely soft and squeezable marshmallow feel, were protected trade dress, it would be virtually impossible for competitors to create alternative toy designs for this item's purpose. Ryan Dec. ¶¶ 158-167. From a toy designer's perspective, each of these claimed trade dress features is necessary to either depict the various characters or animals, or is necessary to create this category of pillow-type plush that is currently trending. *Id*. This is fatal to Kellytoy's trade dress claim of which "the whole is nothing other than the assemblage of functional parts." *Secalt S.A. v. Wuxi Shenxi Constr. Mach. Co*., 668 F.3d 677, 684 (9th Cir. 2012)(citations omitted); *Aurora*, 719 F.Supp.2d at 1146 ("For an overall product configuration to be recognized as a trademark, the entire design must be nonfunctional.") (citations omitted).[5]

Finally, Kellytoy's description of alternative ways to make plush toys is irrelevant, because the features are clearly functional as explained herein. *Arlington Specialties,* 847 F.3d at 420 ("the undisputed evidence shows that the claimed design features affect product quality, so we need not consider the availability of alternative designs for competitors."). Because the claimed trade dress features are functional, the motion should be denied for this reason as well.

---

[5] Kellytoy claims that its trade dress must be evaluated as a whole. However, in every case, including those cited by Kellytoy, the courts evaluate the **individual elements** of the trade dress in order to determine whether the overall trade dress is functional. The principal case relied on by Kellytoy, *Bodum USA,* 927 F.3d 486, is distinguishable because plaintiff in that case identified a collection of very specific features which combined to form the trade dress in its coffee press, such as the particular shape of the handle, the metal band that formed supporting feet, the domed lid, and the rounded knob, and the accused product was a carbon copy. The *Ferrari* case cited by Kellytoy is similarly distinguishable, where plaintiff had a strong, highly distinctive trade dress that was slavishly copied. *Ferrari S.P.A. v. Roberts*, 944 F.2d 1235 (6th Cir. 1991). The same cannot be said for the overly broad trade dress claimed by Kellytoy here.

### C.    Kellytoy Has Not Shown Secondary Meaning In Any Trade Dress

To establish secondary meaning, also called "acquired distinctiveness," Kellytoy must demonstrate that consumers identify the design of its Squishmallow plush with the source of the product rather than the product itself. *Wal-Mart*, 529 U.S. at 211. Consideration of the elements listed in *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998), demonstrates that there is no secondary meaning in the claimed trade dress features of Squishmallows.

***Amount and Manner of Advertising and Media Coverage.*** Kellytoy argues that this factor favors secondary meaning solely based on the number of visits to the Kellytoy website, the number of Instagram, Facebook and Twitter followers, media impressions and digital advertisements. Br. p. 10. However, these alleged activities do not establish secondary meaning in Squishmallows. As explained by the Seventh Circuit, the "proper legal standard" in this regard is whether "in the minds of consumers," the "primary significance" of the claimed Squishmallows trade dress is to identify the trade dress as a Kellytoy product. *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 661 (7th Cir. 1995). In that case, the court rejected plaintiff's "substantial advertising with pictures of its product" as evidence of secondary meaning because the advertising did not encourage consumers to identify the claimed trade dress with the plaintiff, for example, by encouraging consumers to "look for" the trade dress features:

> Advertising that touts a product feature for its desirable qualities and not primarily as a way to distinguish the producer's brand is not only not evidence that the feature has acquired secondary meaning, it directly undermines such a finding. It supports instead the inference that consumers consider the claimed trade dress a desirable feature of the product and not primarily a signifier of source.

*Id*. at 662. Likewise Kellytoy's advertisements and social media references with images of its products do not prove that features of the products were advertised as a way to distinguish the producer's brand.

Ty's marketing expert Kevin McTigue has reviewed all of the advertising materials relied on by Kellytoy to support its claim of secondary meaning, and he "does not believe the Squishmallows advertising creates any association between the claimed trade dress features and a single source in the minds of any significant number of consumers." McTigue Dec. ¶ 44. This is because the materials make no effort to emphasize or call attention to the claimed trade dress. For

16

example, most of the materials relied on by Kellytoy are simple product mentions by the press or third parties that Kellytoy does not control, which do nothing to connect the overall trade dress features with a brand name or source in the eyes of consumers. *See Id*. ¶ 40. To accomplish such a result requires a strategic marketing focus on the trade dress consistently applied through significant expenditures and consistent, widespread consumer exposure, which is not present here. *Id*. ¶¶ 39-40, 57-63.

Even material created by Kellytoy for social media does not associate the claimed product features with Kellytoy, mentioning instead product discounts, contests, or invitations to visit Kellytoy's website, and the advertisements make no mention of, for example, the shape of the toys or the Kawaii design, let alone linking such features to Kellytoy. *Id*. ¶¶ 42-43. Because the advertising materials relied on by Kellytoy make no mention of the claimed trade dress, they do not evidence secondary meaning. *In re Koninklijke Philips Elecs. N.V.*, 2014 WL 5035509, at *4 (T.T.A.B. Sept. 26, 2014) ("In cases of product design, the evidence provided to establish acquired distinctiveness must relate to the promotion and recognition of the specific configuration embodied in the applied-for mark and not to the goods in general."). If anything, Kellytoy's evidence "supports . . . the inference that consumers consider the claimed trade dress a desirable feature of the product and not primarily a signifier of source." *Thomas & Betts*, 65 F.3d at 662.

As explained by Professor McTigue, "the amount expended on advertising efforts by Kellytoy is simply too insignificant to have any expected perceptible impact on consumers even if the advertising was appropriately focused on connecting the alleged Kellytoy trade dress with the brand or source of the products (which is was not, in my opinion.)" McTigue Dec. ¶ 57. Kellytoy claims to spend $25,000-$40,000 monthly in advertising, but in the realm of consumer advertising (with some 300 million consumers in the U.S. alone), this is inconsequential and ineffective amount to reach customers nationally and build a significant brand presence. *Id*. ¶ 59. Case law is in accord. *See, e.g., Mana Prods., Inc. v. Columbia Cosmetics Mfg., Inc.*, 65 F.3d 1063, 1071 (2d Cir. 1995) (no secondary meaning in trade dress of plaintiff's make-up compacts even though $3 million was spent in advertising); *Global Mfg. Group, LLC v. Gadget Universe.Com*, 417 F.Supp.2d 1161, 1171-72 (S.D. Cal., 2006) (No secondary meaning where

17

plaintiff claimed to have spent "hundreds of thousands of dollars in marketing, promoting, advertising costs . . . .").

Kellytoy itself provides no coherent explanation as to how its claimed marketing expenditures contribute to secondary meaning. As discussed in Part II(B) above, most of the advertising touts the functional features of Squishmallows or merely show images of the products, which is not evidence of secondary meaning. *Devan Designs, Inc. v. Palliser Furniture Corp.*, No. 2:91CV00512, 1992 WL 511694, at *7 (M.D.N.C. Sept. 15, 1992), *aff'd*, 998 F.2d 1008 (4th Cir. 1993) ("When advertisements promote the functional and decorative features of a product without promoting an association between good and producer, it is not helpful in establishing secondary meaning."). And the secondary meaning question is one of consumer perception, so any expenditures in "business to business" advertising (Yoon Dec. ¶ 14) are irrelevant. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 (3d Cir. 1994) (product display at trade show did not demonstrate trademark rights, and the proper Lanham Act inquiry occurs "from the perspective of ordinary consumers, not from the perspective of people in the trade."). For these additional reasons, the amounts allegedly spent in advertising Squishmallows do not prove secondary meaning. *McDonald's Corp. v. Burger King Corp.*, 107 F.Supp.2d 787, 790 (E.D.Mich. 2000) (McDonald's failed to show that the use of advertising expenses "was sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of McDonald's or that the use had a substantial impact on the purchasing public.").

***Volume of Sales***. Neither do Kellytoy's sales figures substantiate its claim of secondary meaning. Kellytoy claims that it has sold 40 million Squishmallow products since 2017. Br. pp. 10-11. Apart from the fact that these sales figures include items that do not feature the claimed trade dress features (*see* Part II(A)(2) above), and these figures do not appear to be limited to the United States (Ryan Dec. ¶ 46), this figure is meaningless because it lacks context. "It is well-established that evidence of a product's success in the marketplace does not necessarily show that its design has secondary meaning." *Continental Lab. Prods., Inc. v. Medax Int'l, Inc.* 114 F. Supp. 2d 992, 1002 (S.D. Cal. 2000). This is especially true in a product configuration case because "the

product's market success may well be attributable to the desirability of the product configuration rather than the source-designating capacity of the supposedly distinguishing feature . . . ." *Id.* at 1003 (citations omitted). Indeed, "[l]arge sales of the product may be due to dozens of factors, only one of which may be the drawing power of the trademark." *Id.* The Seventh Circuit has rejected claims of trade dress rights based upon comparable product sales as those claimed by Kellytoy. In *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 393 (7th Cir. 1992), sales exceeding $30 million (in 1992 dollars) were rejected as "entirely circumstantial, and courts have noted that this type of evidence alone is often insufficient to establish secondary meaning."

In *Continental*, the plaintiff's sales figure was insufficient to infer secondary meaning in a product design because the plaintiff "failed to provide any supporting data to place these raw sales figures into a coherent evidentiary context," such as size of the relevant market, market share, whether these sales numbers reflect success in the industry. 1144 F. Supp. 2d at 1003-04. Evidence providing proper context to determine if Kellytoy's sales reflect actual success in the plush toy industry is also missing here. The estimated U.S. market size for plush toys is more than $1 billion annually (Ryan Dec. ¶ 30), and Ty alone has sold more than 2 billion plush toys in the U.S. over the past decades, and sells tens of millions of toys from just two of its product lines in this country each year. Johnson Dec. ¶¶ 7, 13. Kellytoy's claimed sale of 40 million Squishmallows over the past three years (around 13 million per year) appears relatively small by this measure. *See also Milbank Tweed Hadley & McCloy LLP v. Milbank Holding Corp.*, No. CV-06-187-RGK (JTLx), 2007 WL 1438114, at *3 (C.D. Cal. Feb. 23, 2007) (plaintiff's claimed "millions" in revenues alone did little or nothing to establish secondary meaning).

**Length and Manner of Use**. Kellytoy only began selling its toys in late 2017—an short period of time. And Kellytoy's claim that it uses "look for" advertising is simply not true. The statement that the "shape, look, feel, and texture of Squishmallows® branded plush toys constitute Kellytoy Worldwide, Inc.'s proprietary trade dress," found only in small print on some of Kellytoy's more recent (mid-2019) marketing materials, is not "look for" advertising and does not support a claim of secondary meaning. *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 U.S.P.Q.2d 1468, 1517, 2017 WL 6547628, at *54-56 (T.T.A.B. Dec. 20, 2017) (Advertising

which only shows the product configuration without drawing attention to the feature alleged to constitute a trademark or trade dress does not quality as "look for" advertising.). As noted by Professor McTigue, to the extent a consumer would even notice this statement in fine print at the bottom of the page, "consumers lacking a legal education in trade dress law would likely have no idea regarding what the phrase even means," and the phrase "leaves the consumer guessing about what exactly is special, or what Kellytoy thinks is special, about the 'shape, look, feel or texture' of Squishmallows." McTigue Dec. ¶ 45.

*Consumer Testimony and Surveys*. Direct evidence of secondary meaning by way of consumer surveys provides the strongest evidence of secondary meaning (*Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 615 (9th Cir. 1989)), but Kellytoy has offered no such evidence here. Kellytoy instead relies on the alleged "voracious consumer appetite" for Squishmallows as evidence of secondary meaning. Br. p. 11. However, none of the evidence cited proves that consumers connect **the specific trade dress elements claimed** with Kellytoy. "[E]vidence of a product's success in the marketplace does not necessarily show that its design has secondary meaning." *Continental*, 114 F. Supp. 2d at 1001-02.

*Deliberate Copying*. Kellytoy alleges, with no supporting evidence, that "Ty deliberately copied the Squishmallows trade dress," citing to the declaration of Mr. Gottlieb, who admittedly has never seen an actual Ty toy accused of infringement and has no first-hand knowledge of the creation of Ty's products. Br. p. 13; Gottlieb Dec. ¶¶ 18, 20. This is pure speculation and should be rejected out of hand. Moreover, neither Kellytoy nor Gottlieb makes any attempt to explain exactly why they reach this conclusion, failing to conduct any side by side comparisons of the two parties' toys and failing to even discuss any specific similarities of protectable elements—because there are none.

The toy industry is driven by popular trends, as exemplified by Ty's hugely successful pellet-filled Beanie Babies® plush toys in the early 1990's, which caused competitors, **including Kellytoy**, to follow with similar pellet-filled toys made from velboa-type fabric. Ryan Dec. ¶¶ 32-33; Johnson Dec. ¶ 48. As explained by Ms. Ryan, "soft, pillow-like squishie-type products are . . . currently trending in the toy industry and have been for several years." Ryan Dec. ¶ 35. Ty's

20

Squish-a-Boos plush are simply one of several pillow-type products in this space, including toys made by Gund, Fiesta, First and Main, Rhode Island Novelty, Moosh, Walgreen's Brand, and others. Johnson Dec. ¶ 51; Lundeen Dec. ¶¶ 27-29. Ty's sale of pillow-type plush is "competition, not bad faith." *Libman*, 69 F.3d at 1363.

In any event, the salient elements of the nine accused products were not copied from Kellytoy but are based upon and derive from preexisting Ty Beanie Boos® plush toys, the majority of which were introduced well before Squishmallows came to be. Johnson Dec. ¶¶ 15-23. The features present in each of the accused toys, including, for example, the coloration, fabric patterns, oversize sparkle eyes, facial features, ear shape and placement, and horns come directly from Ty's Beanie Boos products as explained in Mr. Johnson's Declaration and exhibits thereto:

| Beanie Boos | Squish-a-Boos | Beanie Boos | Squish-a-Boos | Beanie Boos | Squish-a-Boos |
|---|---|---|---|---|---|
| Kiki 2016 | Kiki 2020 | Dotty 2016 | Dotty 2020 | Slush 2009 | Slush 2020 |
| Fantasia 2015 | Fantasia 2020 | Owen Jan. 2017 | Owen 2020 | Bamboo 2009 | Bamboo 2020 |
| Giselle 2018 | Giselle 2020 | Heather 2018 | Heather 2020 | Zoey 2014 | Zoey 2020 |

Johnson Dec. ¶¶ 15-23 and Exhibits 1-9 thereto (attached as Appendix A hereto for convenience); Ryan Dec. ¶¶ 54-56; 168-170. Indeed, Ty, like many toy makers, has created a range of products through the years based on earlier popular designs, as shown by the following:

21



Ryan Dec. ¶ 56. The features on Ty's Squish-a-Boos come from Ty, not Kellytoy.

Additionally, the fact that the features in Kellytoy's claimed trade dress (egg/bell shaped, simplified Kawaii faces, embroidered facial features, short-pile velvety texture, contrasting and non-monochromatic coloring, and memory foam-like stuffing) were generic and used by Ty and myriad other competitors before Kellytoy came out with its Squishmallows (*see* Part II(A)(1)(b) above) precludes a finding of secondary meaning in such features. *See EFS Mktg. v. Russ Berrie & Co.*, 76 F.3d 487 (2d Cir. 1996) ("troll" doll design cannot have acquired secondary meaning because at least twenty other companies sell similar designs); *Yurman*, 262 F.3d at 115 ("even a showing of secondary meaning is insufficient to protect product designs that are overbroad or 'generic.'"). As demonstrated above, Kellytoy cannot show secondary meaning in its claimed trade dress, and the motion for preliminary injunction should be denied for this reason as well.

## D.     There Is No Likelihood of Confusion Here.

"A trademark is not a property right, but an identifier; so, provided no one is likely to be confused by the alleged infringer, there is no impairment of the interest that the trademark statute protects." *Libman*, 69 F.3d at 1361. An analysis of the relevant likelihood of confusion factors demonstrates that Kellytoy has failed to show a likelihood of confusion here.

***Dissimilarity of the Marks*.** While Kellytoy claims that Squishmallows and Ty's toys are "similar in appearance and suggestion" (Br. p. 18), Kellytoy later makes a contradictory admission: "Kellytoy would never release Squishmallows bearing Ty's specific designs: they do not comport with the Squishmallows aesthetic." Br. p. 23. It is telling that neither Kellytoy nor any of its "experts" makes any effort to provide specific examples or analysis of Ty products that are supposedly confusingly similar to any corresponding Squishmallows. Br. p. 18. This is

22

because there are no such similarities. Instead, Kellytoy bases the alleged similarities on unprotectable, generic features, such as the "bell/egg shape without distinct heads and torsos," the depiction of "animals/creatures without proportionate and pronounced appendages," "Asian style Kawaii faces with repeating and complementary rounded/oval" graphics, "embroidered facial features," and "contrasting and non-monochrome coloring." As explained above, these elements, alone or combined, are generic, functional, lack secondary meaning, and are found within numerous plush toy products made by third parties, and do not constitute a valid trade dress for assessing similarities.

Kellytoy's reliance on Mr. Gottlieb's "expert" opinion to establish confusion should likewise be rejected, because he has no expertise in consumer perception and cannot possibly divine what a consumer may be thinking. An expert witness cannot opine on the question of whether or not there is a likelihood of confusion in any event. *See Int'l Market Brands v. Martin Int'l Corp.*, 882 F. Supp. 2d 809, 814 (W.D. Pa. 2012) (Expert cannot testify as to the ultimate conclusion of likelihood of confusion); *Roederer v. J. Garcia Carrion, S.A.*, 93 U.S.P.Q.2d 1584, 1589 (D. Minn. 2010) (In nonjury trial, testimony as to the ultimate issue of likelihood of confusion "will not help the Court because it merely tells the Court what conclusion to reach.").

Although Kellytoy makes no effort to compare each of Ty's products to Kellytoy's products, a review of Ty's accused toys as compared to the Squishmallow product line demonstrates no similarity of products in any event. *See* comparisons attached as Appendix A hereto (reproduced from Johnson Dec.). In terms of overall appearance of the toys, Ty's Squish-a-Boos toys have a very different look and feel owing to design elements from Ty's other product lines. The Squish-a-Boos faces would not be considered "simplified Asian style Kawaii faces" from a design standpoint. The oversized Squish-a-Boos eyes with their "reflecting" white marks are clearly intended to replicate the look of the shiny plastic eyes on the Beanie Boos plush. They are closer to what would be seen in anime characters rather than kawaii characters, and look nothing like the small, solid black eyes predominant in Kellytoy's toys. Ryan Dec. ¶ 169. The bright patterns used on Ty's products are not associated with kawaii or Japanese style, which is typically considered to be more pastel in tone. *Id*. ¶ 170. The Ty products have an overall

23

different aesthetic that is more reminiscent of legacy Ty products, and are not likely to be presumed by a purchaser to be of the same make as Squishmallows. *Id*. Kellytoy also goes to great lengths to argue that "Squishmallows do not reliably stand" (Br. pp. 14-15), but Ty's products are more triangular, and formed with an oval base that permits the products to stand upright. *See* Johnson Dec. ¶ 4. Squish-a-Boos are not confusingly similar to Squishmallows.

*Strength of Kellytoy's Alleged Mark***.** Kellytoy's alleged mark is weak, since "product design almost invariably serves purposes other than source identification." *TrafFix,* 532 U.S. at 29 (citations omitted). Kellytoy has also failed to show commercial strength of its alleged mark in the form of secondary meaning, and the features alleged to be Kellytoy's trade dress were used by Ty and other competitors long before Squishmallows came on the scene, as discussed above, "a factor arguing against a likelihood of confusion." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 8:15 (5th ed.); *see also P.F. Cosmetique, S.A. v. Minnetonka, Inc.*, 605 F. Supp. 662, 668 (S.D.N.Y. 1985) (the main features of personal care products are designs and motifs commonly used by several competitors, hence the alleged trade dress is weak).

*Marketing Channels***.** Notwithstanding Kellytoy's unsupported assertion that both parties' products are "sold in the same area," Kellytoy says nothing about where Ty's toys are sold, and has provided no evidence to show that parties' products are sold in the same channels of trade, that the predominant purchasers of the parties' goods are similar, or whether the parties' marketing approaches resemble each other. *See Gray v. Meijer, Inc.*, 295 F.3d 641, 649 (6th Cir. 2002). Kellytoy claims that its products are sold at mass-market retailers like Walmart and Target (Br. p. 3), but "Ty does not sell to mass-market merchants like Walmart." Lundeen Dec. ¶ 17. Instead, "[c]onsumers will be presented with Ty's Squish-a-Boos plush mostly at specialty retailers, such as Hallmark, Claire's, and possibly craft stores, among others." *Id.* That the parties' products appeared at the same trade show is not evidence of confusion, because ultimate consumers do not attend trade shows. *Id.* ¶ 4. This element does not support a likelihood of confusion.

***Degree of care likely to be exercised by the purchaser.*** While plush toys are not overly expensive, they are not consumable or disposable in the manner of very cheap items (like cookies). The fact that each of Ty's toys is sold with the famous TY HEART LOGO (discussed below) also distinguishes Ty's products. Where, as here, consumers exercise at least some care, "clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration." *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 203 (3d Cir. 1995). And Kellytoy claims that the target customers for its product "are children between 5 and 14" (Br. p. 20), but toy expert Ms. Ryan states that plush toys "are almost always purchased by and frequently collected by adults." Ryan Dec. ¶ 38. Marketing expert McTigue further states that it is "widely accepted in marketing that children, particularly those under 14, are not a meaningful direct customer for any product" because of the small impact of the direct purchasing power of children under 14. McTigue Dec. ¶ 64. Adults, as purchasers of the products, are likely to exercise reasonable care when purchasing the parties' respective plush.

***Kellytoy's Alleged Evidence of Actual Confusion.*** Kellytoy admits there is no evidence of actual confusion (Br. p. 21), and the claim by Mr. Rauch that a retail buyer informed him at a trade show that Ty was selling products very similar to Squishmallows, apart from being hearsay, is not evidence of consumer confusion in any event. The very nature of the alleged statement demonstrates that the buyer readily distinguished between Ty's products and Squishmallows. *Aurora*, 719 F.Supp.2d at 1162 (emails commenting on the similarities between plaintiff's and defendant's toys was not evidence of confusion: "it is unclear that any of the emails reflect the views of actual consumers. To the extent they do, however, they confirm that individuals familiar with the plush toy market know there are two separate plush toy manufacturers selling small animal toys.").

***Accused infringer's intent.*** "[I]n the product configuration context, a defendant's intent weighs in favor of a finding of likelihood of confusion only if intent to confuse or deceive is demonstrated by clear and convincing evidence, and only where the product's labeling and marketing are also affirmatively misleading." *Versa,* 50 F.3d at 208. Indeed, "a court should not

25

infer that the defendant intended to deceive consumers where it made deliberate efforts to prevent source confusion." *Continental,* 114 F. Supp 2d at 1010 n. 14. There is no evidence that Ty seeks to confuse any consumer or that Ty (a famous plush toy company known for its excellent reputation for quality) is interested in trading on the goodwill of Kellytoy. As explained by Ty's head salesperson:

> I must strongly disagree with any suggestion that we would want to "confuse" a customer into buying a Ty product under some mistaken impression that it came from Kellytoy (or anyone else). Ty's reputation and well-known name in plush helps sell Ty products. We want customers to know they are buying Ty, which is why we prominently affix the Ty heart logo on hang tags and sewn in labels on every single plush product we sell, including Squish-a-Boos.

Lundeen Dec. ¶ 19. Ty's purposeful and clear labelling of its products with the famous TY HEART LOGO, on displays, hang tags and sewn-in labels, proves that Ty made deliberate efforts to **avoid** source confusion, as explained below. *Id*. ¶¶ 18-19.

> ***Ty's Use of the Famous Ty Heart Logo Precludes any Likelihood of Confusion***. There is no likelihood of confusion because each of Ty's accused toys will be advertised and sold in connection with the famous TY HEART LOGO ® that clearly identifies the source of Ty's toys, for example:






| Kiki | Outside Hang Tag | Inside Hang Tag | Permanent Sewn-in Label |

Johnson Dec. ¶¶ 4, 24. The TY HEART LOGO is attached to each Squish-a-Boos product (on the hang tag and the sewn-in label) before it is shipped from the Ty factories. *Id*. ¶¶ 24-25. Ty's famous TY HEART LOGO is registered with the U.S. Trademark Office (reg. nos. 1,722,141 and 2,565,53) and the TY HEART LOGO has been featured on hang tags and sewn-in labels attached to over **2 billion** plush toys sold by Ty in the United States alone. *Id*. ¶¶ 7-8, 25-26. And the TY HEART LOGO is prominently featured at trade shows and in-store displays where Ty products are sold. Lundeen Dec. ¶¶ 3, 13-15. In product configuration trade dress cases, consumers do not

26

rely on a potentially distinctive configuration to identify the source of the product, "rather, they can generally look to the packaging, trademarks, and advertising used to market the product . . . ." *Versa*, 50 F.3d at 203. As such, "clarity of labeling in packaging and advertising will suffice to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration." *Id.* The prominent use of the famous TY HEART LOGO on the displays, hang tags, and sewn-in labels in connection with its Squish-a-Boos product suffices here "to preclude almost all possibility of consumer confusion as to source stemming from the product's configuration line." *Id. See also Sorenson v. WD-40 Co.*, 792 F.3d 712, 727 (7th Cir. 2015)("the prominent display of a well-known trademark . . . along with an allegedly infringing mark is a strong indication that there is no likelihood of confusion."). Indeed, in resolving a prior dispute between the parties years ago, both Kellytoy and Ty agreed that there would be no likelihood of confusion between the parties' brands of plush toys because, in part, each used their respective house marks ("Kellytoy" or "Ty") "customarily and prominently" on their "goods, labels and packaging for goods." *See* Appendix B at p. 3. Prominent use of the parties' respective marks in this case similarly precludes any possible confusion here.

### III.   Kellytoy's Factually Baseless Arguments Are Legally Insufficient To Show Irreparable Harm Or An Inadequate Remedy at Law.

As set forth above, Kellytoy has failed to demonstrate any reasonable likelihood of success on the merits, which in and of itself dooms its preliminary injunction motion. *AM General*, 311 F.3d at 804 ("A party with no chance of success on the merits cannot attain a preliminary injunction."). Even if likelihood of success were established (which it is not), Kellytoy is also required to make a clear showing of irreparable harm and an inadequate remedy at law. *Kraft Foods Group Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th Cir. 2013). Kellytoy has conflated these two separate inquiries, offering only a superficial argument (*see* Br. at 22-24), and failing to establish either requirement.

Under the first element, Kellytoy must prove that any relief that it could be awarded would not leave it "fully repaired" or "would be 'seriously deficient as compared to the harm suffered'," under the specific facts of this case. *Whitaker v. Kenosha Unified Sch. Dist. No. 1*, 858

F.3d 1034, 1046 (7th Cir. 2017) (quoting *Foodcomm Int'l v. Barry*, 328 F.3d 300, 304 (7th Cir. 2003)). In this regard, Kellytoy makes only three cursory arguments: (1) "[i]rreparable injury 'almost inevitably follows' when there is a high probability of confusion;" (2) if there are "quality problems related to Ty's products" any remedy would be inadequate; and (3) advertising and sales of the Ty products would "decrease[] the distinctiveness of the Squishmallows Trade Dress." Br. at 22-23. None of these arguments has merit.

First, Kellytoy's argument that irreparable injury should be presumed from a "high probability of confusion" is based on an outdated concept that was overruled by the Supreme Court in *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006). "The once-flourshing irreparable harm presumption . . . is as good as gone." 4 Anne Gilson Lalonde, *Gilson on Trademarks* § 14.02[D] (Matthew Bender). *See also Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, No. 14 C 7424, 2015 U.S. Dist. LEXIS 74700 at *37 (N.D. Ill. June 10, 2015) ("Although the Seventh Circuit has not addressed whether *eBay* applies to preliminary injunctions in Lanham Act cases, the court has held that 'eBay governs a motion for preliminary injunction in a copyright case.' . . . The Court sees no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case.") (citation omitted). Kellytoy's argument also ignores the fact that, as demonstrated in Part II(D) above, no confusion of any sort exists here, let alone a "high probability" of consumer confusion since, among other things, the presence of the famous TY HEART LOGO "preclude[s] almost all possibility of consumer confusion as to source stemming from the product's configuration." *Versa*, 50 F.3d at 203.

Second Kellytoy's speculation that "if" there is a quality problem with Ty's products, it would reflect poorly on Kellytoy and cause injury for which compensation would be inadequate (Br. at 23) again improperly presumes a likelihood of confusion and is unsupported by any facts. Ty is one of the best known toy brands in the world and follows robust safety and quality standards for each of its products, and each product style is certified by accredited safety testing laboratories to ensure that the product comports with all standards of the Consumer Product Safety Commission and the American National Standards Institute. Johnson Dec. ¶ 11. Kellytoy

cannot point to any facts that would render its highly speculative concern over the quality of Ty's products rational or reasonable.

Third, Kellytoy's assertion that allowing the Ty products' continued sale pending the litigation would "decrease[] the distinctiveness of the Squishmallows Trade Dress" (Br. at 23) ignores Kellytoy's admission that the "aesthetic" of the Ty products is different from the Squishmallow products. *Id.* In addition, as demonstrated in Part II(A)(1)(b), the market is teeming with third-party products containing Kellytoy's purported "trade dress," which products were sold long before Squishmallows were introduced and continue to be sold to this day. The claimed trade dress is hence not "distinctive" or susceptible to any dilution by Ty.

At its core, Kellytoy is worried about losing sales to Ty, which is a monetary loss, not irreparable harm. *See Kraft Foods*, 735 F.3d at 740. Another court recently concluded as much in denying Kellytoy's similar motion for a TRO: "The principal injuries discussed by Plaintiff are strictly economic and Kellytoy has not shown that other alleged harms—loss of goodwill, reputational harm—would be difficult to value under the facts of this case or otherwise inadequately compensated with monetary damages." Norton Dec. Ex. 12-C p. 3. Kellytoy has failed to demonstrate any harm that is irreparable or for which there is no adequate legal remedy.

## IV. THE IRREPARABLE HARM TO TY AND TO THE PUBLIC GREATLY OUTWEIGHS KELLYTOY'S CLAIMED IRREPARABLE HARM.

Kellytoy has not demonstrated entitlement to the relief it seeks, so balancing harms is not required. Nevertheless, the fact remains that the irreparable harm a preliminary injunction would impose on Ty and the public greatly outweighs any harm claimed by Kellytoy. *See Valencia v. City of Springfield*, 883 F.3d 959, 965-66 (7th Cir. 2018). As explained in the accompanying Declaration of Tania Lundeen, Ty's Senior VP of Sales and Licensing, blocking Ty's ability to fill significant orders would damage Ty's reputation and its long-established relationships with major retailers. Retailers have placed orders for Squish-a-Boos plush with the expectation that shelves will be filled with Ty product as soon as they are available. If Ty is unable to deliver the ordered products, this will injure Ty's reputation as a reliable source for products and will inevitably lead to customers buying products from Ty's competitors. And the next time Ty

29

introduces a new product line, which happens frequently, customers will be disinclined to purchase such new products from Ty. Lundeen Dec. ¶ 22. As in *AM General Corp.*, "the balance of irreparable harms to the parties and others weighs enormously against the requested injunction." 311 F.3d at 835. And where, as here, there is no likelihood of confusion, the public interest is greater served by having a greater choice of products in the marketplace. *Int'l Jensen, Inc. v. Metrosound U.S.A., Inc.*, 4 F.3d 819, 827 (9th Cir. 1993).

## V.     SECURITY FOR ANY INJUNCTION SHOULD BE SET FOR AT LEAST ███

In the unlikely event this Court were to issue a preliminary injunction, Kellytoy is required to post a bond "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." FED. R. CIV. P. 65(c). "When setting the amount of security, district courts should err on the high side." *Mead Johnson & Co. v. Abbott Labs.*, 201 F.3d 883, 888 (7th Cir. 2000), *am. on den. of reh'g*, 209 F.3d 1032 (7th Cir. 2000). "[A]n error in the other direction produces irreparable injury, because the damages for an erroneous preliminary injunction cannot exceed the amount of the bond." *Id.* at 887–88 (citing cases).

According to the calculations of accounting expert Glenn Dalhart, which are based on Ty's Squish-a-Boos orders to date and the sales history of a comparable Ty product line, Ty would likely incur lost profits in the range of ███████ should an injunction issue and it takes 2 years to resolve the underlying action in Ty's favor. In fact, Ty's lost profits could easily exceed this amount if the Squish-a-Boos product becomes even moderately successful or consumer reception exceeds initial expectations. Dalhart Dec. ¶¶ 9-22. Therefore, in the event that the Court determines that Kellytoy is entitled injunctive relief, any resulting injunction must be conditioned on Kellytoy posting a bond of not less than ███.

## CONCLUSION

For the foregoing reasons, Ty respectfully requests that the Court deny Kellytoy's motion for a preliminary injunction.

Dated: March 31, 2020

Respectfully submitted,

**TY INC.**

*/s/ J. Aron Carnahan*
        *One of its attorneys*

J. Aron Carnahan
Don J. Mizerk
Michael D. Hayes
Laurie A. Haynie
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Direct: 312.526.1612
Fax: 312.655.1501
aron.carnahan@huschblackwell.com
don.mizerk@huschblackwell.com
michael.hayes@huschblackwell.com
laurie.haynie@huschblackwell.com

**CERTIFICATE OF SERVICE**

The undersigned counsel hereby certifies that the public version of the foregoing

document was served upon all counsel of record via filing with CM/ECF on March 31, 2020,

while the confidential version was served via email.


/s/ J. Aron Carnahan
J. Aron Carnahan
HUSCH BLACKWELL LLP
120 South Riverside Plaza, Suite 2200
Chicago, IL 60606
Direct: 312.526.1612
aron.carnahan@huschblackwell.com