UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| KELLYTOY WORLDWIDE, INC. and KELLYTOY (USA), INC., | ) ) ) | |
| Plaintiffs, | ) ) | 20 C 748 |
| vs. | ) ) | Judge Gary Feinerman |
| TY, INC. and DOES 1-10, | ) ) ) | |
| Defendants. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Kellytoy Worldwide, Inc. and Kellytoy (USA), Inc. (together, "Kellytoy") bring

trademark and trade dress claims against Ty, Inc. under the Lanham Act, 15 U.S.C. § 1051 *et*

*seq*., and Illinois law. Doc. 1. Kellytoy moves for a preliminary injunction to prevent Ty from

distributing its Squish-a-Boos line of plush toys on the ground that the line infringes Kellytoy's

Squishmallows plush toy line. Doc. 20. The motion is denied.

**Background**

Kellytoy and Ty both create, manufacture, distribute, and sell plush toys. Doc. 21 at 7-8;

Doc. 1 at ¶¶ 15, 17. Kellytoy created the Squishmallows plush toy line in 2016 and to date has

shipped forty million units. Doc. 21 at 8-9; Doc. 24 at ¶¶ 9, 23. Kellytoy identifies the

following toys as representative samples of Squishmallows:



Doc. 24-1.

Ty's Squish-a-Boos plush toy line is scheduled for distribution this year. Doc. 37 at 36-37; Doc. 57 at 29. On January 16, 2020, Kellytoy wrote Ty a letter asserting that the Squish-a-Boos line infringes the Squishmallows line. Doc. 28 at ¶ 6. Kellytoy identifies the following Squish-a-Boos as illustrating Ty's infringement of the Squishmallows line.



Doc. 28-1 at 2.

Both Ty and Kellytoy rely on declarations to support their competing positions. Kellytoy objects to Ty's expert declarations under Evidence Rule 702. Docs. 58-60. Most pertinent here, Kellytoy objects to the declaration of Ty's marketing expert, Kevin McTigue, on the ground that he "has absolutely no toy-industry related experience whatsoever" and thus has "fail[ed] to lay a

sufficient record as to his qualifications and expertise." Doc. 58 at 2. McTigue's declaration offers opinions regarding Ty's advertising costs and marketing, Doc. 37 at 19-20, 23-24, 27, 32, and his experience working and teaching in the field of digital and traditional advertising, Doc. 44 at ¶¶ 2-10, qualifies him to testify on those subjects. Kellytoy does not explain why the plush toy sector is meaningfully different from the sectors in which McTigue has experience, and thus fails to show why the court should exclude his opinions.

Kellytoy also objects to certain portions of Ty's expert and lay declarations. Docs. 58-63. Most pertinent here, Kellytoy objects on relevance and personal knowledge grounds to certain averments made by Tania Lundeen, Ty's Senior Vice President of Sales and Licensing, regarding the irreparable harm Ty would face if Kellytoy were granted a preliminary injunction. Doc. 63. Those objections are overruled, as Lundeen persuasively avers that she is "familiar with all of Ty's large national retail accounts," "know[s] most of Ty's sales representatives personally," and attends "trade shows" and Ty's "annual sales meeting." Doc. 41 at ¶¶ 2, 5.

Kellytoy's other evidentiary objections are overruled for similar reasons, at least insofar as the court relies on Ty's declarations in resolving Kellytoy's preliminary injunction motion.

### Discussion

Injunctive relief is available under the Lanham Act "to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office or to prevent a violation under subsection (a) … of section 1125," which prohibits trademark infringement. 15 U.S.C. § 1116(a). "[A] party seeking a preliminary injunction must satisfy three requirements. It must show that: (1) absent a preliminary injunction, it will suffer irreparable harm in the interim period prior to final resolution of its claims; (2) traditional legal remedies would be inadequate; and (3) its claim has some likelihood of succeeding on the merits. If the moving party satisfies

each of these requirements, the court proceeds to the balancing phase of the analysis. In the balancing phase, the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief. In so doing, the court employs a sliding scale approach: the more likely the plaintiff is to win, the less heavily need the balance of harms weigh in [its] favor; the less likely [it] is to win, the more need [the balance] weigh in [its] favor. Where appropriate, this balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the public interest)." *Valencia v. City of Springfield*, 883 F.3d 959, 965-66 (7th Cir. 2018) (internal quotation marks and citations omitted). "[A] preliminary injunction is an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it." *Orr v. Shicker*, 953 F.3d 490, 501 (7th Cir. 2020) (internal quotation marks omitted).

## I.  Likelihood of Success on the Merits

Kellytoy's motion focuses on its trade dress claim under § 43(a) of the Lanham Act, 11 U.S.C. § 1125(a). "The Lanham Act permits a civil action against any person who uses 'any word, term, name, symbol, or device' 'in connection with any goods or services' in a manner which 'is likely to cause confusion' as to the source of those goods or services." *Bodum USA, Inc. v. A Top New Casting Inc.*, 927 F.3d 486, 491 (7th Cir. 2019) (quoting 15 U.S.C. § 1125(a)(1)(A)). "As with any other trademark, infringement of a product's trade dress is actionable under the [Lanham] Act." *Ibid.*; *see also Blau Plumbing, Inc. v. S.O.S. Fix-It, Inc.*, 781 F.2d 604, 608 (7th Cir. 1986) (recognizing that "trade dress is a form of trademark"). To prevail on its claim, Kellytoy must establish "that it owns a valid trade dress in [its Squishmallows line's] design, that the trade dress is not functional, and that [Ty's Squish-a-Boos

line] [i]s likely to cause consumer confusion as to its source." *Bodum*, 927 F.3d at 491. The court addresses each requirement in turn.

A.     **Validity of Kellytoy's Trade Dress**

Trade dress includes "the design or packaging of a product that is so distinctive as to identify the manufacturer or source." *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 418 (7th Cir. 2017). A plaintiff may define its trade dress as "the total image or overall appearance of a product, including size, shape, color, texture, and graphics." *AM Gen. Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 814 (7th Cir. 2002) (internal quotation marks omitted). "While trade dress is most often defined as a totality of elements, there is no reason why the plaintiff cannot define a list of elements consisting of less than the totality of features." *Id*. at 813 (quoting 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 8:1 (4th ed. 2001)).

Kellytoy claims trade dress protection in the overall appearance of its Squishmallows line, Doc. 21 at 12-15, so the pertinent analysis focuses on the line's "total appearance rather than individual design elements in isolation." *Bodum*, 927 F.3d at 492. Kellytoy's Senior Vice President of Sales and Development, Jeanne Yoon, describes the Squishmallows trade dress as: (1) "a specific egg/bell shape (including the lack of a discrete head and torso) lacking proportionate, pronounced limbs"; (2) "abstract, embroidered facial features based on the Japanese Kawaii [meaning 'cute'] style"; (3) "oval/rounded graphic features"; (4) "an ultra-soft shell and mooshy, silky stuffing," Doc. 21 at 9 (citing Doc. 24 at ¶ 10); and (5) "contrasting and non-monochrome coloring," *id*. at 24 (citing Doc. 28-1). Ty submits that this claimed trade dress is not valid because: (1) it is not common to the entire Squishmallows line; (2) it is too broad to put Ty on notice of Kellytoy's claim; (3) it is generic; and (4) it has not acquired a secondary meaning. Doc. 37 at 11-18. Those arguments are considered in turn.

As to the first, "[w]hen it is claimed that the trade dress is inherent in an entire series or line of products, the proponent faces the 'particularly difficult challenge' of proving the validity of a broadly defined trade dress which is common to all items in the series or line." 1 J. Thomas McCarthy, *McCarthy on Trademarks & Unfair Competition* § 8:5.50 (5th ed. 2020). Ty argues that Kellytoy does not meet this challenge because its claimed trade dress is not present in the entire Squishmallows line. Doc. 37 at 17-18. Kellytoy counters that "Ty conflates the Squishmallows *trademark* (used across numerous different plush lines) with the Squishmallows *Trade Dress*," which is present only in its "traditionally shaped Squishmallows." Doc. 57 at 11. Kellytoy has the better of the argument, as a plaintiff is entitled to claim trade dress protection for a subset of its products. *See AM Gen.*, 311 F.3d at 813 ("[T]he plaintiff in a trade dress action under section 43(a) of the Lanham Act is free to seek trade dress protection for whatever products or packaging it sees fit.") (internal quotation marks omitted).

As to its second argument, Ty asks the court to hold, as did the court in *Kellytoy USA, Inc. v. Dan-Dee, International, Inc.*, No. 18-cv-05399 (C.D. Cal. Feb. 7, 2019) (unreported, but reproduced at Doc. 48-13 at 65-74), that Kellytoy's claimed trade dress is too broad and vague to put Ty on notice of which aspects of the Squishmallows design are protected. Doc. 37 at 13. When read in the light of the images of the Squishmallows toys at issue, the court cannot say that Kellytoy's description fails to put Ty on notice of the contours of its claimed trade dress.

Ty's third argument is that Kellytoy's claimed trade dress is generic. Settled precedent holds that "generic marks—those that refe[r] to the genus of which the particular product is a species—are not registrable as trademarks." *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992) (alteration in original) (internal quotation marks and citation omitted). Kellytoy has shown some likelihood of proving that its trade dress is not generic, as the five components

set forth above are not ubiquitous among or intrinsic to plush toys in general. *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 638 (6th Cir. 2002) ("[G]eneric product configurations are not protectable as trade dress under § 43(a)."); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 32 (2d Cir. 1995) ("[T]he fact that a trade dress is composed exclusively of commonly used or functional elements might suggest that that dress should be regarded as unprotectable or 'generic,' to avoid tying up a product or marketing idea.").

As to its fourth argument, Ty correctly observes that "[a] distinctive design may be protected as a trademark only if it has acquired secondary meaning—that is, if consumers associate the design with a particular manufacturer." *Bodum USA, Inc. v. La Cafetiere, Inc.*, 621 F.3d 624, 627 (7th Cir. 2010). A trade dress acquires secondary meaning when, "in the minds of the public, the primary significance of a product feature … is to identify the source of the product rather than the product itself." *Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291 (7th Cir. 1998) (alteration in original) (quoting *Qualitex Co. v. Jacobson Prods. Co.*, 514 U.S. 159, 163 (1995)). A plaintiff can establish secondary meaning "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market and proof of intentional copying." *Thomas & Betts*, 138 F.3d at 291 (internal quotation marks omitted); *see also Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 424 (7th Cir. 2019) (similar).

Kellytoy cites no consumer surveys or direct consumer testimony, but argues that the other pertinent considerations support its view that the Squishmallows trade dress has acquired a secondary meaning. Doc. 21 at 13-18. Among those considerations is evidence of broad social media engagement with Squishmallows. *Id.* at 17; Doc. 27 at ¶¶ 13-14 (identifying the consumer

engagement in terms of internet search analytics and engagement on social media). According to Kellytoy, consumer engagement on social media "driv[es] awareness of Squishmallows," which in turn drives awareness of "the Trade Dress associated with it." Doc. 57 at 16 (citing Doc. 57-3 at ¶¶ 34, 63); *see also* Doc. 21 at 15-16 (describing the high level of website traffic and social media engagement with the Squishmallows line). Kellytoy's conclusion does not follow its premise, as popularity and engagement with a product do not necessarily suggest a connection between the product and its *source*. *See Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 213 (2000) ("[A]lmost invariably, even the most unusual of product designs—such as a cocktail shaker shaped like a penguin—is intended not to identify the source, but to render the product itself more useful or more appealing.").

Kellytoy also contends that "Squishmallows have been consistently and continuously sold in the marketplace since 2017, and they have always included the features … which embody the product's trade dress." Doc. 21 at 17. Kellytoy adds that extensive customer online engagement with Squishmallows reflects its advertising efforts, *id*. at 15-16, and that the advertising connects the brand with the trade dress in various ways, Doc. 57 at 17-18. Kellytoy's point is pertinent, as "advertising which encourages consumers to identify the claimed trade dress with the particular producer is some evidence of secondary meaning." *Thomas & Betts*, 138 F.3d at 292. According to Kellytoy, its advertisements "create an association between the Trade Dress and the source of origin of Squishmallows" by prominently displaying Squishmallows and emphasizing their appearance, which visually connects the trade dress with its source, and by stating that the "shape, look, feel, and texture of the Squishmallows branded plush toys constitute Kellytoy['s] proprietary trade dress." Doc. 21 at 17 (citing Doc. 24. at ¶¶ 18-21); Doc. 24-8 at 3; Doc. 57 at 16-17.

Along these lines, Kellytoy's toy industry expert, Richard Gottlieb, avers that Squishmallows "possess a distinctive overall look and feel."  Doc. 22 at ¶¶ 13-16.  Because the toys are for children, Kellytoy believes that depictions of Squishmallows in advertisements will most effectively establish their understanding of the line's trade dress.  Doc. 57 at 19.  Ty's marketing expert McTigue disagrees, averring that he "do[es] not believe the Squishmallows advertising creates any association between the claimed trade dress features and a single source in the minds of any significant number of consumers."  Doc. 44 at ¶ 44.  Ty maintains that Kellytoy's advertisements "make no effort to emphasize or call attention to the claimed trade dress," as they do not mention "for example, the shape of the toys or the Kawaii design."  Doc. 37 at 23-24.

Although Kellytoy's advertising uses the term "trade dress," it does not specify which features comprise that trade dress or suggest how to distinguish Squishmallows from similar plush toys.  Doc. 57 at 17; *see also id.* at 14 ("The Moosh-Moosh branded plush toys, for example, possess most of the elements that comprise the Squishmallows Trade Dress, but they are not egg/bell-shaped.").  Kellytoy cites a handful of consumer comments expressing "uncertainty" over whether certain plush toys are part of the Squishmallows line, Doc. 27 at ¶ 16, to support its argument that consumers associate Squishmallows with a particular source, Doc. 21 at 17, but some of those consumers indicate that they are drawn to the product's features and not its source, *see*, *e.g.*, Doc. 27-2 at 2 (consumer did not think the plush toy she purchased was a Squishmallow, but noted that "it is just as squishy and soft").  Even so, Kellytoy's choice of images in its advertisements, its identifying those images as "original," and its nod to the "shape, look, feel, and texture" of Squishmallows, Doc. 57 at 17, could contribute to development of secondary meaning.  *See Thomas & Betts*, 138 F.3d at 292 ("While we utilized as an example of

such advertising the phrase 'look for the oval head,' we did not establish that such explicit direction was necessary. The advertising which prominently features the oval-shaped heads of T & B's ties could also function to draw consumers' attention to the shape and to associate it with T & B."); *Weber-Stephen Prods. LLC v. Sears Holding Corp.*, 2015 WL 5161347, at *2 (N.D. Ill. Sept. 1, 2015) ("Advertising … put the trade dress and the Weber name together in front of the public. This gave rise to the possibility that consumers would draw a connection between the trade dress and Weber.") (citation omitted). *But see Kohler Co. v. Honda Giken Kogyo K.K.*, 125 U.S.P.Q.2d 1468, 2017 WL 6547628, at *55 (T.T.A.B. Dec. 20, 2017) ("'Look for' advertising refers to advertising that directs the potential consumer in no uncertain terms to look for a certain feature to know that it is from that source. It does not refer to advertising that simply includes a picture of the product or touts a feature in a non-source identifying manner.") (internal quotation marks omitted).

As for the volume of sales and place in the market, Kellytoy contends that the pervasiveness and positive reception of Squishmallows weigh in favor of finding that the line has established a secondary meaning. Doc. 21 at 18. Kellytoy has sold over 40 million Squishmallows, *id.* at 9, and Yoon describes the line as Kellytoy's most successful product "in terms of market penetration, press coverage, social media buzz, and customer recognition," Doc. 24 at ¶ 27. Within the plush toy market, Kellytoy has been featured in gift guides and won awards. Doc. 21 at 18 (citing Doc. 26 at ¶¶ 10, 20-31). Ty responds that there is "no evidence" that the primary significance of the Squishmallows' features is to identify them as a Kellytoy product, which is the key consideration in the secondary meaning analysis. Doc. 37 at 9. Ty's point has some validity, as the Squishmallows' popularity could very easily reflect the toys'

appealing nature rather than consumer identification of their source. *See Samara Bros.*, 529 U.S. at 213.

As to intentional copying, Kellytoy asserts that Ty's use of the term "Squish" in its plush toys' name and the similarity between the two lines indicate that Ty intentionally copied from Kellytoy. Doc. 57 at 22; Doc. 22 at ¶¶ 19-22. Ty retorts, correctly, that Kellytoy's charge is speculative. Doc. 37 at 27. In any event, "[c]opying is … evidence of secondary meaning [only] if the defendant's intent in copying is to confuse consumers and pass off [its] product as the plaintiff's," not when the intent of copying is to "exploit[] a particularly desirable feature." *Thomas & Betts Corp. v. Panduit Corp.*, 65 F.3d 654, 663 (7th Cir. 1995) (internal quotation marks omitted). It would be hard to conclude that Ty intended to confuse consumers and pass off its toys as Kellytoy's given that, as discussed below, Ty prominently places tags on Squish-a-Boos identifying them as Ty products.

On balance, Kellytoy's evidence suffices to establish some, but not a substantial, likelihood of showing that the Squishmallows trade dress has acquired a secondary meaning. It follows that Kellytoy has shown some, but not a substantial, likelihood that it has claimed a valid trade dress.

### B. Functionality

Where, as here, "the trade dress is unregistered … , the party seeking protection has the burden to show [that the trade dress] is not functional." *Arlington Specialties*, 847 F.3d at 418. "A product feature is functional … 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.' Even if a product feature does not satisfy that definition, it can still be functional if it is a 'competitive necessity,' that is, if its exclusive use 'would put competitors at a significant non-reputation-related disadvantage.'" *Id.* at 419 (citation omitted) (quoting *TrafFix Devices, Inc. v. Mktg. Displays, Inc.*, 532 U.S. 23, 32-33

(2001)); *see also Specialized Seating, Inc. v. Greenwich Indus., LP*, 616 F.3d 722, 727 (7th Cir. 2010) (explaining that a trade dress is functional when the product "looks the way it does in order to be a better [product], not in order to be a better way of identifying who made it"). "The question [in assessing functionality] is not … whether the claimed trade dress has less utility than alternatives, … [but] whether the design feature affects the product quality or cost or is merely ornamental." *Arlington Specialties*, 847 F.3d at 420 (internal quotation marks omitted).

Two cases illustrate how these principles are applied. In *Bodum*, the plaintiff alleged that a competitor's French press coffeemaker infringed the trade dress of its product, which included a "metal band surrounding the carafe that forms support feet and the handle attachment, the domed lid, the rounded knob atop the plunger, and the C-shaped handle." 927 F.3d at 489-90, 492. The Seventh Circuit held that the jury reasonably could have found that the claimed trade dress was nonfunctional because there were less complex and less expensive alternative designs and materials available to competitors. *Id*. at 492-94. In so holding, the court explained that while French presses must have a handle and feet, the specific design of the handle and feet on the plaintiff's product did not confer a utilitarian advantage, allowing the jury to find that the claimed trade dress features were "merely ornamental" and thus "not necessary to make the [product] work better as a French press coffeemaker." *Id*. at 493. By contrast, in *Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 647 F.3d 723 (7th Cir. 2011), a trademark infringement case, the Seventh Circuit held that the quilted diamond design of toilet paper was functional. *Id*. at 731. To support its holding, the court emphasized the plaintiff's utility patents in the quilted diamond design, as well as the design's utilitarian properties of "softness, comfort, and absorption." *Id*. at 729-30.

Several factors bear on whether a trade dress element is functional, including: "(1) the existence of a utility patent, expired or unexpired, that involves or describes the functionality of an item's design element; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; [and] (5) the effect of the design feature on an item's quality or cost." *Bodum*, 927 F.3d at 492 (quoting *Ga.-Pac.*, 647 F.3d at 727-28). Applying those factors here shows that Kellytoy has some likelihood of success in showing that its asserted trade dress is not functional.

As to the first factor, Kellytoy has never filed for a utility patent for the Squishmallows toy or any element thereof. Doc. 24 at ¶ 41. That weighs in favor of nonfunctionality.

As to the second factor, Kellytoy asserts that the Squishmallows' egg/bell shape does not confer a utilitarian advantage over other shapes, such as "round, square, oblong, or realistic … animal[] shape," meaning that the shape "represents a design choice." Doc. 21 at 20. Ty counters that Squishmallows provide two utilitarian advantages—they can be used as pillows and can offer comfort and support—drawing an analogy to *Georgia-Pacific*, where the softness and comfort of the toilet paper's quilted diamond design were held to render the design functional. Doc. 37 at 19-20 (citing *Ga.-Pac.*, 647 F.3d at 728-32). Kellytoy retorts that plush toys make for equally good pillows regardless of their design, Doc. 21 at 22 (citing Doc. 24. at ¶¶ 42-44); Doc. 57 at 12-13, and are equally soothing and comforting, Doc. 57 at 13. And Kellytoy distinguishes *Georgia-Pacific* on the ground that the trade dress here, unlike that of the toilet paper, is not entirely "dictated by 'comfort' or 'softness,'" as evidenced by its use of embroidery on the Squishmallows' faces rather than softer means of adding facial features. *Ibid.* Kellytoy has the better of the argument, as there is no evidence that the specific features comprising its claimed

14

trade dress provide a utilitarian advantage over alternative features—for example, different stuffing material or a different shape. The features thus appear to be "merely ornamental" and "not necessary to make [the Squishmallows] work better." *Bodum*, 927 F.3d at 493; *see ibid.* ("Whether it is more advantageous for a French press to have *a handle*, however, is not the pertinent inquiry; the question is whether there is an advantage to having *this designed handle* … .").

As to the third factor—whether advertising touts the utilitarian advantages of the item's design elements—Ty observes that Kellytoy's advertisements assert that Squishmallows "have offered comfort, support, and warmth as pillow pals" and are "[s]quishy and comforting." Doc. 44 at ¶¶ 49-51. Kellytoy admits that it advertises "the fact that the Squishmallows can be used as pillows," Doc. 21 at 22, and that its advertisements convey that Squishmallows, "like all plush toys, … provide comfort to those who hold and squeeze them," Doc. 57 at 13. That Kellytoy advertises that the Squishmallows' design makes them particularly comforting and effective as pillows cuts in favor of functionality. *See Ga.-Pac.*, 647 F.3d at 730 (holding that advertisements linking the trade dress feature to "utilitarian benefits" weigh in favor of functionality).

As to the fourth factor—the lack of, or difficulty in creating, alternative designs for the item's purpose—Kellytoy contends that the variety of plush toys on the market demonstrates that Ty has ample design alternatives. Doc. 21 at 22 (citing Doc. 24 at ¶¶ 42-44). Ty responds that Kellytoy cannot claim the Squishmallows' facial features as part of its claimed trade dress because facial features are necessary for a plush toy to look like an animal. Doc. 37 at 21; *see Aurora World, Inc. v. Ty Inc.*, 710 F. Supp. 2d 1115, 1147 (C.D. Cal. 2009) ("[T]he eyes of the toys are functional because they are essential to the goal of making the plush toys look like

animals."). Kellytoy retorts that it does not seek to enjoin Ty from using facial features on its Squish-a-Boos, but only to protect the use of the claimed facial features when combined with the other elements comprising the claimed trade dress. Doc. 57 at 13-14; *see Bodum*, 927 F.3d at 493-94 (noting that exhibits showing "competing manufacturers' French presses featuring different design elements, including those made of different materials, with differently shaped handles, lids, plunger knobs, and frames," indicated that alternative designs were available). On the limited preliminary injunction record, Kellytoy has shown that there are alternative designs for plush toys, which weighs in favor of nonfunctionality.

As to the fifth factor—the effect of the design feature on an item's quality or cost— Kellytoy submits that the Squishmallows' silky stuffing, embroidered features, and soft exterior are all more expensive than available alternatives. Doc. 24 at ¶¶ 11-12. Ty responds that if the trade dress is as broad as Kellytoy claims, then "it would be virtually impossible for competitors to create alternative toy designs," which would affect cost and quality. Doc. 37 at 21-22 (citing Doc. 43 at ¶¶ 158-167). Ty's argument goes primarily to the validity of the claimed trade dress, not its functionality. Kellytoy has shown that the Squishmallows' design does not confer a cost or quality advantage, which weighs in favor of nonfunctionality.

On balance, Kellytoy has demonstrated some chance of success in showing that its asserted trade dress is nonfunctional.

### C.     Likelihood of Confusion

"A trademark is not a property right, but an indicator; so, provided no one is likely to be confused about the alleged infringer, there is no impairment of the interest that the trademark statute prevents." *Libman Co. v. Vining Indus., Inc.*, 69 F.3d 1360, 1361 (7th Cir. 1995). "To decide if there is a likelihood of confusion, [the court] ask[s] whether consumers who might use either product would likely attribute them to a single source. [The court] use[s] seven factors in

making this decision: (1) the similarity between the marks; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care consumers are likely to use; (5) the strength of plaintiff's mark; (6) actual consumer confusion; and (7) the defendant's intent to 'palm off' its product as that of another." *Uncommon*, 926 F.3d at 425; *see also Badger Meter, Inc. v. Grinnell Corp.*, 13 F.3d 1145, 1152 (7th Cir. 1994) (applying the same factors in a trade dress case). "[T]hough no one factor is decisive, the similarity of the marks, the intent of the defendant, and evidence of actual confusion are the most important factors … ." *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) (internal quotation marks omitted).

As to the first factor—similarity of the trade dress—Kellytoy argues that Squish-a-Boos are similar in appearance to Squishmallows and have all the elements of the Squishmallows trade dress. Doc. 21 at 24-25. In support, Kellytoy cites Gottlieb's opinion, which submits in pertinent part: "Ty appears to have attempted to fully duplicate the look and feel of the Squishmallows trade dress. Coupling the look with a sounds-like name, Squish-[a]-Boo, makes for a product that consumers will easily confuse with the Squishmallows product." Doc. 22 at ¶ 22; *see also* Doc. 57-3 at ¶ 49 (opining that the Squish-a-Boos' size is part of "Ty's attempt to make [them] appear similar to and compete directly with Kellytoy's Squishmallows"). Still, Kellytoy concedes that the dueling product lines have "minor differences, such as Ty using larger eyes," Doc. 21 at 24, and it acknowledges that the plush toy market as a whole has a variety of similar toys that are distinguishable from one another, Doc. 57 at 14 ("The Moosh-Moosh branded plush toys, for example, possess most of the elements that comprise the Squishmallows Trade Dress, but they are not egg/bell shaped."). On that point, Ty emphasizes that the Squish-a-Boos' design does not encompass all features of Kellytoy's claimed trade dress, such as the Squishmallows' "simplified Asian style Kawaii faces" and egg/bell shapes. Doc. 37

17

at 30-31. On balance, Kellytoy has made a modest, though not particularly strong, case that the Squish-a-Boos' design is similar to the Squishmallows' trade dress.

As to the second factor—the similarity of the products—the key inquiry is "whether the products are the kind the public attributes to a single source." *Ty*, 237 F.3d at 899 (internal quotation marks omitted). The parties' arguments track those they make on the first factor, with Kellytoy making a modest case that the products are similar.

As to the third factor—the area and manner of use—the court must "assess whether there is a relationship in use, promotion, distribution or sales between the [competing] goods," including whether they are "sold and advertised in the same venues and … target[] similar buyers." *Id.* at 900-01 (internal quotation marks omitted). According to Kellytoy, the large retailers that sell Squishmallows, including Walgreens, Fred Meyer, Kroger, and CVS, also sell Ty products, Doc. 21 at 26 (citing Doc. 24 at ¶¶ 22, 31), and Squishmallows and Squish-a-Boos have appeared at the same trade show, *ibid.* (citing Doc. 23 at ¶ 3). Ty responds that trade shows are not relevant, as "ultimate consumers do not attend trade shows," and that Ty sells its products through "specialty retailers, such as Hallmark [and] Claire's." Doc. 37 at 31 (citing Doc. 41 at ¶¶ 4, 17). Kellytoy retorts by showing that its products and Ty's are sold through the same specialty retailers. Doc. 57-3 at ¶¶ 50-52; Doc. 57-2 at ¶ 13. This factor is somewhat stronger for Kellytoy than the first two.

As to the fourth factor—the degree of care customers are likely to use—Kellytoy submits that because parents "may not" readily identify differences in plush toys, Doc. 22 at ¶ 23, and because plush toys are inexpensive, Doc. 24 at ¶ 38, and tend to be impulse purchases, Doc. 22 at ¶ 24, consumers are unlikely to distinguish between the two lines. Doc. 21 at 26-27. Ty responds that the adults who purchase plush toys will likely use reasonable care and that the

prominence of Ty's logo on its Squish-a-Boos will minimize any confusion. Doc. 37 at 32. Ty

offers the following images of its logo on the Squish-a-Boo toys.

   

*Id.* at 8. Both sides make valid points. The products are relatively inexpensive and may be

impulse purchases, increasing the likelihood of confusion. *See CAE, Inc. v. Clean Air Eng'g,*

*Inc.*, 267 F.3d 660, 683 (7th Cir. 2001) ("The more widely accessible and inexpensive the

products and services, the more likely that consumers will exercise a lesser degree of care and

discrimination in their purchases."). At the same time, Ty's prominent placement on the Squish-

a-Boos of its extremely well-known logo, Doc. 41 at ¶¶ 18-19, is highly likely to mitigate any

consumer confusion as to the toys' true source. *See Syndicate Sales, Inc. v. Hampshire Paper*

*Corp.*, 192 F.3d 633, 637 (7th Cir. 1999) ("The most common and effective means of apprising

intending purchasers of the source of goods is a prominent disclosure on the container, package,

wrapper, or label of the manufacturer's or trader's name … [and when] that is done, there is no

basis for a charge of unfair competition.") (alterations in original) (quoting *Versa Prods. Co. v.*

*Bifold Co.*, 50 F.3d 189, 203 (3d Cir. 1995)). And while the possibility of "reverse confusion"—

*i.e.*, that Ty might so flood the market with Squish-a-Boos that consumers mistakenly think that

Squishmallows are Ty's, too—in theory can give rise to a trade dress claim, *see Sands, Taylor &*

*Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957-58 (7th Cir. 1992), that is not the theory of

infringement Kellytoy puts forward in this suit. So this factor weighs heavily against Kellytoy.

As to the fifth factor—the strength of the trade dress—the court assesses "the

distinctiveness of the mark, or more precisely, its tendency to identify the goods sold under the

mark as emanating from a particular … source." *Eli Lilly & Co. v. Nat. Answers, Inc.*, 233 F.3d 456, 464 (7th Cir. 2000) (alteration in original). To support the strength of its asserted trade dress, Kellytoy points to its evidence of secondary meaning and the fact that it protects its trade dress by sending demand letters and bringing infringement suits. Doc. 21 at 27 (citing Doc. 28 at ¶ 4). But as noted above, Kellytoy makes only a modest case that the Squishmallows line has developed secondary meaning. Moreover, as Ty correctly observes, the features comprising the Squishmallows trade dress were used in plush toys prior to the Squishmallows' arrival in the market, supporting the proposition that the claimed trade dress is weak. Doc. 37 at 31. And Kellytoy acknowledges that prior designs of plush toys "may be relevant to the strength of the [Kellytoy] mark," though it maintains that Ty has not offered sufficient evidence that the consumers were aware of those prior designs. Doc. 57 at 10. Given the court's secondary meaning discussion above, as well as Kellytoy's acknowledgement that some plush toys share elements of its trade dress, *id*. at 14, this factor weighs against Kellytoy.

As to the sixth factor—actual consumer confusion—Andrew Rauch, Kellytoy's Vice President of Sales for the Amusement Division, avers that a Kellytoy customer told him that Ty "was selling products very similar to Kellytoy's Squishmallow line of plush toys" and that "many other Kellytoy customers told [other Kellytoy employees] the same thing." Doc. 23 at ¶¶ 2-3. This evidence does not advance Kellytoy's position, as the court is "concerned here with evidence of *actual* confusion, not a mere risk of confusion … . The similarity of the two marks is a separate consideration in [the] analysis, and although it does create a risk of confusion, it does not constitute evidence of actual confusion." *Eli Lilly*, 233 F.3d at 465. Kellytoy's evidence establishes only the possibility of confusion, so this factor favors Ty. *See Bretford Mfg., Inc. v. Smith Sys. Mfg. Corp.*, 419 F.3d 576, 579 (7th Cir. 2005) ("The district court found

that V-shaped legs do not signal Bretford as a source. The record supports this conclusion; indeed, Bretford has no evidence that the leg design prompts 'Bretford' in buyers' minds. There are no surveys and no evidence of actual confusion.").

As to the seventh factor—the defendant's intent to "palm off" its product as that of another—Kellytoy cites what it views as Ty's history of "cop[ying] the look and feel" of other toys, "essentially drowning out the originals in the marketplace," Doc. 21 at 28 (citing Doc. 24 at ¶¶ 53-59), and the similarities between the Squishmallow and Squish-a-Boo names, Doc. 57 at 22. But the prominence of Ty's well-known label on the Squish-a-Boos severely undercuts the claim that Ty is attempting in bad faith to pass off Squish-a-Boos as a Kellytoy product.

On balance, Kellytoy's likelihood of success of establishing likelihood of confusion, while not negligible, is weak.

*   *   *

As noted, to succeed on its Lanham Act trade dress claim, Kellytoy must establish "that it owns a valid trade dress in the [Squishmallows line's] design, that the trade dress is not functional, and that the [Squish-a-Boos line] was likely to cause consumer confusion as to its source." *Bodum*, 972 F.3d at 491. Kellytoy has established a modest likelihood of showing that the Squishmallows trade dress is valid, and a somewhat greater likelihood of showing that the Squishmallows trade dress is nonfunctional. Kellytoy is far less likely, however, to succeed on the likelihood of confusion element of its claim. Accordingly, while Kellytoy has demonstrated "'at least' a negligible chance of success on the merits" of its claim, *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016), its chance of success on the present record is weak.

## II.    Irreparable Harm, Balance of Equities, and Public Interest

Although a party seeking a preliminary injunction must show "more than a mere possibility of harm," the harm need not "actually occur before injunctive relief is warranted," nor

must it "be certain to occur before a court may grant relief on the merits." *Whitaker ex rel. Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1044-45 (7th Cir. 2017). "Rather, harm is considered irreparable if it cannot be prevented or fully rectified by the final judgment after trial." *Id*. at 1045 (internal quotation marks omitted).

The Seventh Circuit has applied a presumption of irreparable harm in trade dress suits. *See AM Gen.*, 311 F.3d at 805, 831-32 (recognizing, in a trade dress case, "the law's presumption that trademark dilution or infringement threatens irreparable injury for which there is no adequate remedy at law"). Ty argues that the presumption no longer applies in light of *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391-94 (2006), which rejected the presumption in patent cases, and *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012), which did the same in copyright cases. But despite *eBay* and *Flava Works*, the Seventh Circuit has continued to recognize the likelihood of irreparable harm in trademark cases. *See Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 741 (7th Cir. 2013) ("[I]rreparable harm is especially likely in a trademark case because the difficulty of quantifying the likely effect on a brand of a nontrivial period of consumer confusion (and the interval between the filing of a trademark infringement and final judgment is sure not to be trivial).").

Irreparable harm in trademark cases can arise from the plaintiff's inability "to control the nature and quality of the defendants' goods." *Int'l Kennel Club of Chi., Inc. v. Mighty Star, Inc.*, 846 F.2d 1079, 1092 (7th Cir. 1988) (internal quotation marks omitted). Kellytoy contends that it faces such irreparable harm to its goodwill and reputation because it "would never release Squishmallows bearing Ty's specific designs[, as] they do not comport with the Squishmallows aesthetic," and because it is unable to employ its rigorous quality controls over Squish-a-Boos. Doc. 21 at 29 (citing Doc. 24 at ¶¶ 29, 50); Doc. 57 at 28. Kellytoy also submits that it could

22

lose profits and business opportunities if Ty is not enjoined. Doc. 21 at 29. Ty counters that it is a well-known toy brand that follows robust safety and quality standards. Doc. 37 at 35-36 (citing Doc. 39 at ¶ 11). That may be true, but because Kellytoy is unable to exercise control over Ty's implementation of those standards, it has shown some likelihood of irreparable harm. *See Ty*, 237 F.3d at 902 ("[I]t is virtually impossible to ascertain the precise economic consequences of intangible harms, such as damage to reputation and loss of goodwill, caused by [trademark] violations.") (internal quotation marks omitted); *Processed Plastic Co. v. Warner Commc'ns, Inc.*, 675 F.2d 852, 858 (7th Cir. 1982) ("Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the acts of another.") (internal quotation marks omitted). That said, much of the harm Kellytoy faces comes from the potential of lost sales, and such harm is capable of valuation in the event Kellytoy ultimately succeeds on its trade dress infringement claim. *See Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 363 (7th Cir. 1993) (recognizing that where sales of an infringing product deprive the plaintiff "of profits rightfully belonging to it, it can recover those … lost profits in a damages judgment at the conclusion of the lawsuit").

In balancing the harms, "the court weighs the irreparable harm that the moving party would endure without the protection of the preliminary injunction against any irreparable harm the nonmoving party would suffer if the court were to grant the requested relief." *Valencia*, 883 F.3d at 966 (internal quotation marks omitted). As discussed above, Kellytoy has shown that a better than negligible, though weak, chance of success on the merits, and it has also shown that it may suffer some irreparable harm without a preliminary injunction. On the other side of the ledger, enjoining Ty from proceeding with its distribution of Squish-a-Boos would significantly damage its reputation and longstanding relationships with major retailers. As Lundeen describes

23

it, if retailers agree to purchase inventory and Ty is unable to deliver, the retailers will be left with insufficient inventory, Ty's reputation as a reliable source for products will be damaged, and retailers will be less likely to purchase from Ty in the future. Doc. 41 at ¶¶ 2, 22, 25. Ty thus faces significant irreparable harm should the court grant a preliminary injunction. *See Freudenberg Household Prods. LP v. Time Inc.*, 2006 WL 1049569, at *9 (N.D. Ill. Apr. 18, 2006) ("An injunction that would stop Defendants from pursuing their sales and marketing of their products during the pendency of this litigation could have disastrous effects on the permanent success of the products."); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 387 (7th Cir. 1984) ("In deciding whether to grant a preliminary injunction, the court must also consider any irreparable harm that the defendant might suffer from the injunction.").

Whether it would serve the public interest to grant a preliminary injunction depends primarily on the likelihood that Ty is engaging in unlawful behavior. The public interest is served in granting injunctions against likely infringers "because enforcement of the trademark laws prevents consumer confusion." *Eli Lilly*, 233 F.3d at 469. At the same time, "[a]llowing competitors to copy will have salutary effects in many circumstances," *TrafFix Devices*, 532 U.S. at 29, as "consumers benefit from the option to buy a copy that has some added premium (*e.g.*, faster delivery, cheaper pricing) provided by the competitor," *Badger Meter*, 13 F.3d at 1151 (citations and internal quotation marks omitted); *see also TrafFix Devices*, 532 U.S. at 29 ("Trade dress protection must subsist with the recognition that in many instances there is no prohibition against copying goods and products. In general, unless an intellectual property right such as patent or copyright protects an item, it will be subject to copying."); *Samara Bros.*, 529 U.S. at 213 ("Consumers should not be deprived of the benefits of competition with regard to the utilitarian and esthetic purposes that product design ordinarily serves by a rule of law that

24

facilitates plausible threats of suit against new entrants based upon alleged inherent distinctiveness."); *Phx. Entm't Partners v. Rumsey*, 829 F.3d 817, 825 (7th Cir. 2016) ("Trademark, by contrast [to copyright], is aimed not at promoting creativity and invention but rather at fostering fair competition.").

Kellytoy has not shown that the balance of harms and public interest favor entry of a preliminary injunction. Given Kellytoy's weak case on the merits, the balance of the harms would need to weigh far more heavily in its favor for a preliminary injunction to be warranted. *See Valencia*, 883 F.3d at 966. Accordingly, Kellytoy has not shown on the present record that it is entitled to the "extraordinary remedy" of a preliminary injunction. *Orr*, 953 F.3d at 501 (internal quotation marks omitted).

## Conclusion

Kellytoy's motion for a preliminary injunction is denied.

August 25, 2020

_____
United States District Judge